**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **(1) TONY ALMEIDA, (2) LESLIE ALMEIDA,** )<br>**(3) CARY CUYLER, (4) SUSAN CUYLER,** )<br>**(5) LANA GARDNER, (6) CHARLES** )<br>**GARDNER (7) CHRISTIAN LARSEN,** )<br>**(8) KAREN B. LARSEN, (9) THOMAS** )<br>**RIBAUDO, and (10) CORI RIBAUDO,** )<br>**Individually and on Behalf of All Others** )<br>**Similarly Situated,** )<br> )<br>        **Plaintiffs,** )<br> )<br>**v.** )<br> )<br>**(1) BOKF, NA, d/b/a BANK OF OKLAHOMA** )<br> )<br>        **Defendant.** ) | **Case No. 17-cv-00126-JED-FHM**<br>**(CLASS ACTION)** |

**FIRST AMENDED**
**CLASS ACTION COMPLAINT**

Plaintiffs Tony Almeida, Leslie Almeida, Cary Cuyler, Susan Cuyler, Lana Gardner, Charles Gardner, Christian Larsen, Karen B. Larsen, Thomas Ribaudo, and Cori Ribaudo ("Plaintiffs"), individually and on behalf of all others similarly situated ("Class"), allege the following information, facts, and causes of action against Defendant BOKF, NA, d/b/a Bank of Oklahoma ("Defendant BOKF"). Plaintiffs' allegations are based on, among other things, their personal knowledge and their counsels' investigation of publically available information.

## I.      INTRODUCTION

1.      In a conduit municipal bond offering, a municipal entity issues bonds on behalf of a borrower, which may be a private college, hospital, or senior housing facility. The borrower entity then agrees to make interest and principal payments to bondholders from the revenues generated by the operations of the underlying facility. Christopher Brogdon ("Brogdon") and

Dwayne Edwards ("Edwards") utilized conduit municipal bond offerings to defraud investors out of hundreds of millions of dollars.

2.      This case arises out of a connection to a fraudulent scheme that began in the early-1990s. Brogdon was very involved in the financial industry and held several securities licenses. Although Brogdon was barred for life from the securities industry—not once, but twice (in 1984 and 1986)—for violations of securities rules and regulations, Brogdon has been in the business of raising money to acquire and renovate senior housing facilities for over two decades.

3.      In the early-1990s, Brogdon began a fraudulent investment scheme in which he would conduct municipal bond offerings under the guise of acquiring and renovating senior housing facilities. He continued this fraudulent activity for over two decades, conducting forty municipal bond offerings that raised approximately $170 million. In total, Brogdon conducted fifty-four securities offerings that generated nearly $190 million. Brogdon had several management companies, which he personally controlled, that operated the senior housing facilities and were responsible for managing the money acquired through the municipal bond offerings. Brogdon used these management companies to create a large fraudulently crafted entity that commingled and shared investor funds amongst all of the various facilities.

4.      The offering documents that were provided to prospective municipal bonds investors specifically stated that the money raised from the offerings would be used to build, purchase, or otherwise acquire and renovate senior housing facilities, which were to serve as collateral for the municipal bonds. The documents also assured investors that payments of interest and principal would come from the revenues generated by the specific facilities.

5.      Defendant BOKF entered into trust agreements for thirty-nine of the forty bond offerings conducted by Brogdon. As Trustee, Defendant BOKF was responsible for holding the

invested funds in trust accounts and safeguarding the investments for the benefit of the investors. Further, Defendant BOKF was to direct a specific portion of the investment into a debt service reserve fund ("DSRF").  Brogdon assured investors that he would not use those funds unless they were needed to satisfy debt obligations, and if used, he would promptly restore the funds. Brogdon also assured investors that he would provide them with the required financial statements and notice of any material events (i.e., missing payment obligations, sale of any collateral facilities, or the need to draw down on the DSRFs).

6.      Brogdon failed to honor his assurances.  He took investment proceeds for personal use, commingled the proceeds and used them for purposes not specified in the offering documents, failed to file the required financial statements, and made regular draws on the DSRFs.  Further, he failed to disclose this activity to existing or prospective investors.  Investors were thus unaware of the activity and tricked into believing that their bond programs were in good operating order.

7.      Defendant BOKF was aware of, and heavily involved in, the misdeeds of Brogdon.  It knew that he was making interest payments out of the DSRFs, and it knew that he was not promptly replenishing the funds taken from the DSRFs.  Defendant BOKF never reported this information and never made any attempts to correct or prevent that activity.  It was also aware that at least one of the facilities serving as collateral for one of the bond offerings was sold in a foreclosure sale due to a failure to pay taxes on it.  Defendant BOKF also failed to notify investors of that information.  Further, Defendant BOKF improperly released and transferred investor funds from its trust accounts to the various management companies without confirming that those funds were going to be used as provided by the offering documents.

8.     Defendant BOK knowingly and willingly assisted in the Ponzi-like scheme orchestrated by Brogdon.  As noted, Defendant BOKF served as Trustee on nearly all of the bond offerings, and it continued to serve as Trustee for subsequent bond offerings despite becoming aware of the fraudulent activity taking place and the material misrepresentations and omissions being made to both existing and prospective investors.  Defendant BOKF failed to notify or disclose Brogdon's activities, including his violations of the bond offering documents, his precarious financial condition, the loss of collateral through foreclosure, and the drawing down on the DSRFs.  Further, Defendant BOKF misled investors in response to investor inquiries concerning the bond programs, diverted and disbursed money to management companies other than those the investors intended to use and without ensuring that the funds would be used as the investors expected, and violated its fiduciary duties by knowingly and willingly helping others commit fraud, conversion, and breach of fiduciary duty.

9.     Brogdon also had help from Robert W. Lawson, Lawson Financial Corporation ("Lawson Financial"), Anthony Cantone, and Cantone Research, Inc. ("Cantone Research").  Lawson Financial and Cantone Research both served as underwriters on many of the bond offerings conducted by Brogdon.  As underwriters, Lawson Financial and Cantone Research helped conduct new bond offerings, oversaw the selling of the bonds, and raised money from new investors.  Lawson Financial and Cantone Research engaged in this conduct despite their full awareness of the material misrepresentations and omissions in the bond offering documents.

10.     Robert W. Lawson and his business, Lawson Financial, knew about the misdeeds of Brogdon.  They knew about his financial situation, and they knew that he had at least three bond programs in forbearance.  Mr. Lawson even helped get those programs into forbearance by getting investor consent.  Nevertheless, Mr. Lawson and Lawson Financial continued to assist

with new bond offerings and helped raise money from new investors despite their knowledge of the problems involving Brogdon.

11.     Anthony Cantone and his business, Cantone Research, also knew about the misdeeds of Brogdon.  They knew about the financial difficulties, the forbearance agreements, and the various violations of the bond offering documents.  Nevertheless, Mr. Cantone and Cantone Research continued to assist with bond offerings and provided loans and other financial means of assistance despite their knowledge of the problems involving Brogdon.

12.     Defendant BOKF, Mr. Lawson, Lawson Financial, Mr. Cantone, and Cantone Research were each highly compensated for the roles they played in assisting Brogdon.

13.     Edwards was enamored with Brogdon.  Edwards described Brogdon as "brilliant" and as a "big-time operator."  He had never met or spoken with Brogdon, but in April 2014, Edwards sought out Brogdon to discuss purchasing some of the facilities that Brogdon was selling in Georgia and Alabama.

14.     In May 2014, Edwards and his partner, Todd Barker ("Barker"), officially met with Brogdon.  They agreed to the sale and purchase of four properties in Georgia.  The agreement specified that the facilities would be funded through various municipal bond offerings.  Edwards and Barker further agreed to use the *same financing team* that had been assisting Brogdon.  Then, in late-2014, Edwards began discussing the possibility of acquiring four additional facilities from Brogdon—which included the Opelika Facility.  In total, Edwards and Barker purchased eight senior housing facilities from Brogdon.

15.     Edwards developed a strong relationship with Brogdon.  They talked almost weekly to negotiate purchases of various facilities or to discuss financial questions.  Edwards had

become so impressed by Brogdon that Edwards framed and hung the letter of intent that Brogdon signed in May 2014.

16.     As noted, Edwards' financing team was the same team that handled the bond offerings for Brogdon (i.e., the same team responsible for assisting with Brogdon's Ponzi-like scheme)—Defendant BOKF, Mr. Lawson, Lawson Financial, Mr. Cantone, and Cantone Research.  Defendant BOKF served as Trustee for six of the nine offerings conducted by Edwards.  On each of those offerings, the underwriter was Lawson Financial.  Cantone Research also served as an underwriter for Edwards.  It served in that capacity for two of his bond offerings.  Edwards' financial team helped him create the same fraudulent scheme that they had helped create for Brogdon.  They even helped him acquire other necessary players, like Defendant BOKF.  Specifically, Mr. Lawson was the one who suggested using Defendant BOKF as Trustee on the bond offerings conducted by Edwards and Barker.  Mr. Lawson made that suggestion based upon his prior relationship with Defendant BOKF.  Edwards was told that Marrien Neilson ("Neilson") and Mary Campbell ("Campbell") would be their main contacts with Defendant BOKF.  Neilson and Campbell were also the main contacts for Brogdon.

17.     Through these means, Edwards began a fraudulent scheme that mirrored the one established by Brogdon.  Edwards and Barker raised money through several bond offerings with the purported purpose of building, purchasing, or otherwise acquiring and renovating senior housing facilities in Georgia and Alabama.  They set up several limited liability companies, which they controlled, to serve as the borrowers in the bond offerings.  Like Brogdon, they also established several management companies.  Edwards and Barker used their scheme, limited liability companies, and management companies to conduct nine different bond offerings and raise approximately $62 million.  A list of the offerings conducted by Edwards and Barker,

specifying for each offering the Trustee, the related senior housing facilities, and the borrower and management entities (owned and controlled by Edwards and Barker), is attached hereto as **Exhibit "1**.**"** Hereinafter, reference to the offerings conducted by Edwards and Barker controlled entities will be referred to as the "Edwards Offerings."

18.     Like Brogdon, Edwards and Barker used offering documents that provided several assurances to prospective investors.  They assured investors that the money raised from the Edwards Offerings would be used to build, purchase, or otherwise acquire and renovate a specific senior housing facility and that the interest and principal payments would be made using the revenues generated by that facility.  They further assured investors that the money raised from the Edwards Offerings would be used for specific purposes.  For example, some of the proceeds were to be used as working capital for the facility; other proceeds were dedicated to renovations; and some would be used to create the DSRF.  Most importantly, the specified uses were solely for the facility specifically related to the particular Edwards Offering—not other facilities or entities owned or controlled by Edwards and Barker.  And finally, Edwards and Barker assured prospective investors that neither they nor their management facilities would receive any management fees unless the underlying facility was generating enough revenue to pay the expenses, including interest and principal payments.  In other words, Edwards and Barker could not receive any management fees if they were drawing down on the DSRFs.

19.     Like Brogdon, Edwards and Barker failed to honor their assurances.  Edwards almost immediately began commingling funds between the various Edwards Offerings.  He started commingling a few days after the *second* offering.  He used the commingled proceeds for purposes not specified in the offering documents (i.e., to finance new offerings, acquire new facilities, and for different personal purposes).  He continued the mismanagement of proceeds

and facility revenues even after he began improperly drawing down on various DSRFs.

20.     Defendant BOKF served as Trustee on six of the nine Edwards Offerings.  It failed to notify existing or prospective investors of various violations, material misrepresentations, and omissions related to the Edwards Offerings.  Importantly, Defendant BOKF was well aware of the wrongdoings perpetrated by Brogdon, but it never notified investors that Edwards and Barker were purchasing these facilities out of the Ponzi-like scheme created by Brogdon.  Once again, Defendant BOKF plainly violated its fiduciary duties by overlooking obvious red flags and helping others commit fraud, conversion, and breach of fiduciary duty.

21.     With Brogdon, Edwards, and Barker, Defendant BOKF participated in two separate schemes to defraud investors out of millions of dollars.  It continued to assist in these Ponzi-like schemes until the schemes began to collapse from late-2015 through mid-2016.

22.     On November 20, 2015, the United States Securities and Exchange Commission ("SEC") sued Brogdon (and several related entities) in connection with his Ponzi-like scheme that defrauded investors out of more than $190 million. *See SEC v. Christopher Freeman Brogdon, et al.*, No. 15-cv-08173-KM-JBC (D.N.J.) (filed Nov. 20, 2015).

23.     In December 2015, Edwards met with Defendant BOKF.  He submitted a proposal to use the DSRFs for four of the Edwards Offerings to make debt service payments for approximately seven to ten months (the proposal related to the Savannah Offering, the Columbus Offerings, the Gainesville Offerings, and the Waterford Offering).  He explained his financial difficulties, proposed several remedial measures, and entered into a replenishment agreement with Defendant BOKF regarding the DSRFs.

24.     Edwards began drawing on the DSRFs in February 2016, but his replenishment payments stopped in June 2016.  At that time, Edwards began drawing on the DSRFs of the other two Edwards Offerings for which Defendant BOKF served as Trustee—the Rome Offering and the Douglas Offering.   Edwards continued these draws until August 2016; at that point, Defendant BOKF *finally* declared a default on the bonds and began searching for receivers.

25.     On January 20, 2017, the SEC sued Edwards and Barker (and several related entities) for the same or substantially similar fraudulent activity for which it sued Brogdon in November 2015. *See SEC v. Dwayne Edwards, et al.*, No. 2:17-cv-00393-ES-SCM (D.N.J.) (filed Jan. 20, 2017).  Edwards and Barker ran a Ponzi-like scheme just like Brogdon, defrauding investors out of approximately $62 million.  *See id.*

## II.     PARTIES

### A.     Plaintiffs

26.     Plaintiff Tony Almeida is an individual who resides at 1639 Perdido Bay, Villages, Florida 32162.  He invested in the following Edwards Offerings wherein the Trustee was Defendant BOKF:

Invested $10,000 in Douglas-Coffee County GA Indl Auth First Mtg Rev Oxton Pl Douglas LLC Proj-Ser A Int Rate 7.375%.  Maturity 09/01/2044 Dated 08/28/2014.
Purchased on 8/25/14.

Invested $10,000  in  Montgomery Ala Med Clinic Brd 1976 East Rev First Mtg-Waterford PL ALF LLC Proj-Ser A Int rate 7.000%.  Maturity 05/01/2045 Dated 05/14/2015 CUSIP 613061-AG-5.
Purchased on 05/13/15.

Invested $17,000 in Savannah GA Economic Dev Auth Rev First Mtg-Savannah ALF LLC Proj-Ser A Int Rate 7.250%.  Maturity 01/01/2045 Dated 01/16/2015.
Purchased on 01/13/15.

27.     Plaintiff Leslie Almeida is an individual who resides at 1639 Perdido Bay, Villages, Florida 32162. She invested in the following Edwards Offerings wherein the Trustee was Defendant BOKF:

> Invested $15,000 in Savannah GA Economic Dev Auth Rev First Mtg-Savannah ALF LLC Proj-Ser A Int Rate 7.250%. Maturity 01/01/2045 Dated 01/16/2015 CUSIP 80483C-LN-9.
> Purchased on 01/13/15.

28.     Plaintiffs Cary Cuyler and Susan Cuyler are husband and wife and reside at 24529 Parlange Court, Leesburg, Florida 34748. They invested in the following Edwards Offerings in a joint account wherein the Trustee was Defendant BOKF:

> Invested $32,803.04 in Columbus GA Development Authority Rev First Mtg- Columbus ALF, LLC – Proj Ser A Int Rate 7.20%. Maturity 08/01/2015 Dated 07/24/2025 CUSIP 19912HFK0.
> Purchased on 07/22/15.

> Invested $50,000.00 in Douglas-Coffee County GA Indl Auth First Mtg Rev Oxton Pl Douglas LLC Proj-Ser A Int Rate 7.375%. Maturity 09/01/2044 Dated 08/28-2014.
> Purchased on 08/25/14.

> Invested $19,695.60 in Montgomery Ala Med Clinic Brd 1976 East Rev First Mtg-Waterford PL ALF LLC Proj-Ser A Int Rate 7.000%. Maturity 05/01/2045 Dated 05/14/2015 CUSIP 613061-AG-5.
> Purchased on 05/12/15.

> Invested $50,005.00 in Savannah GA Economic Dev Auth Rev First Mtg-Savannah ALF LLC Proj-Ser A Int Rate 7.250%. Maturity 01/01/2045 Dated 01/16/2015 CUSIP 80483C-LN-9.
> Purchased on 01/13/15.

29.     Plaintiffs Lana Gardner and Charles Gardner are husband and wife and reside at 580 Little River Path, Villages, Florida 32162. They invested in the following Edwards Offerings in a joint account wherein the Trustee was Defendant BOKF:

> Invested $25,000 in Cave Spring Housing Development Corporation First Mtg Rev Rome GA; Rome ALF LLC Proj-Ser A 2014 Int Rate 7.25%. Maturity 12/01/2044 Dated 12/17/2014 CUSIP 149596CF3.
> Purchased on 12/12/14.

Invested $25,000 in Gainesville and Hall Development Authority Rev First Mtg-Gainesville ALF LLC Proj-Ser A Int Rate 6.375%.  Maturity 03/01/2027 Dated 03/25/2015 CUSIP 362754GT4.
Purchased on 04/02/15.

Invested $55,000 in Savannah GA Economic Dev Auth Rev First Mtg-Savannah ALF LLC  Proj-Ser A Int Rate 7.250%.  Maturity 01/01/2022 Dated 01/16/2015 CUSIP 80483C-LP-4.
Purchased on 01/13/15.

30.     Plaintiffs Christian Larsen and Karen B. Larsen are husband and wife and reside

at 24508 Parlange Court, Leesburg, Florida 34748.   They invested in following Edwards

Offerings in a joint account wherein the Trustee was Defendant BOKF:

Invested $49,231.50 in Montgomery Ala Med Clinc Brd 1976 East Rev First Mtg-Waterford PL ALF LLC Proj-Ser A Int Rate 7.000%.  Maturity 05/01/2045 Dated 05/14/2015 CUSIP 613061-AG-5.
Purchased on 05/12/15.

Invested $6,005.00 in Columbus GA Dev Auth Rev First Mtg-Columbus ALF LLC Proj-Ser A Int Rate 7.20%.  Maturity 08/01/2045 Dated 07/24/2015 CUSIP 19912HFK0.
Purchased on 07/22/2015.

31.     Plaintiffs Thomas Ribaudo and Cori Ribaudo are husband and wife and reside at

216 Del Rio Drive, Villages, Florida 32159.  They invested in the following Edwards Offerings,

in an account titled as "joint tenants with right of survivorship," wherein the Trustee was

Defendant BOKF:

Invested $29,824.13 in Columbus GA Development Authority Rev First Mtg- Columbus ALF, LLC -Proj Ser A Int Rate 7.20%.  Maturity 08/01/2015 Dated 07/24/2015 CUSIP 19912HFK0.
Purchased on 07/24/15.

Invested $75,000 in Douglas-Coffee County GA Indl Auth First Mtg Rev Oxton Pl Douglas LLC Proj-Ser A Int Rate 7.375%.  Maturity 09/01/2044 Dated 08/28/2014.
Purchased on 8/25/14.

Invested $40,000.00 in Montgomery Ala Med Clinic Brd 1976 East Rev First Mtg-Waterford PL ALF LLC Proj-Ser A Int rate 7.000%.   Maturity 05/01/2045 Dated 05/14/2015 CUSIP 613061-AG-5.
Purchased on 05/13/15.

**B.**      **Defendant BOKF, NA, d/b/a Bank of Oklahoma**

32.      Defendant BOKF, NA, doing business as Bank of Oklahoma, is a publically traded company with headquarters in Tulsa, Oklahoma.

33.      Defendant BOKF provides various financial services—particularly, as it relates to this action, corporate trust services for municipal bond offerings.  It serves as Trustee for municipal bond offerings throughout the county, with those services being provided through its Corporate Trust Department.

34.      Defendant BOKF has several duties with regards to the bondholders (i.e., investors).  As Trustee, it must ensure compliance with the terms of the offering documents, notify the investors of any noncompliance or violations, oversee and safeguard investor proceeds and transactions involving the trusts accounts, and transfer funds in accordance with the uses specified in the offering documents.  Defendant BOKF owes the investors the duties of good faith, loyalty, care, and disclosure.

35.      Here, Defendant BOKF violated those duties and caused the investors significant losses.  Specifically, as Trustee, Defendant BOKF was directly responsible for disbursing funds or making payments in accordance with the terms of the Edwards Bonds.  As Trustee, it was also responsible for obtaining and reviewing the borrower's financial information.

36.      Defendant BOKF employed a Senior Vice President, Cyndi Wilkinson ("Wilkinson"), to manage its Corporate Trust Department.  Wilkinson was in control of several employees who were responsible for ensuring compliance with the duties owed and for the management of various trust accounts.

37.     The executive employee in charge of the accounts related to Edwards was, at all relevant times, Campbell.   As noted herein, Campbell was also the trust executive for the accounts related to Brogdon.

38.     Defendant BOKF's Corporate Trust Department also employed a manager who was responsible for generating new business, ensuring issuer compliance with trust terms and managing other staff charged with ensuring compliance, and also ensuring that Defendant BOKF, as Trustee, was properly meeting its duties.   For much of the relevant period, the manager involved with Edwards was Marrien Neilson ("Neilson").   As noted herein, Neilson was also the manager involved with Brogdon.

39.     Further, Neilson worked with Mr. Lawson to solicit business from Edwards while she was helping further the fraudulent activity of Brogdon.   Defendant BOKF eventually (after the fraudulent schemes began to collapse) fired Neilson for the role she played in assisting Brogdon and Edwards.   Neilson later filed a defamation lawsuit against Defendant BOKF.   *See Neilson v. BOKF National Association*, No. 4:16-cv-00569-GKF-FHM (S.D. Tex.) (filed Jan. 7, 2016).

40.     Defendant BOKF's actions demonstrate a corporate strategy that protected the interests of the bond sponsors, not the bondholders.   As Trustee, Defendant BOKF was charged with protecting the investing bondholders.   Rather than meeting that responsibility, Defendant BOKF and its employees catered to bond sponsors in order to secure commissions and other types of compensation.   By failing to properly discharge the duties owed to investors, Defendant BOKF violated its fiduciary duties and significantly harmed those it was charged with protecting.

**C.     Relevant Non-Parties**

41.     Brogdon is sixty-eight years of age.  He resides in Atlanta, Georgia.  Brogdon was engaged in raising money for the acquisition and renovation of senior housing facilities for more than two decades.  On November 20, 2015, Brogdon was sued by the SEC in connection with his Ponzi-like scheme that defrauded investors out of more than $190 million.

42.     Edwards is fifty-four years of age. He resides at 850 Carroll Road, Latta, South Carolina 29565.  He founded Oxton Senior Living, LLC ("OSL"), and he is a fifty percent owner of the limited liability companies that served as the borrower entities in the Edwards Offerings. Barker owns the remaining fifty percent.  Edwards was the managing member of the borrower entities.  He also founded and owns Manor House Senior Living, LLC ("Manor House").  He has used Manor House to manage the various facilities since March 2016.  On January 20, 2017, Edwards was sued by the SEC in connection with a Ponzi-like scheme, just like Brogdon's, that defrauded investors out of approximately $62 million.

43.     Barker is forty-five years of age.  He resides at 1029 Cherokee Road, Perry, Georgia 31069.  Like Brogdon and Edwards, Barker has been involved with senior housing facilities for over two decades.  He owns fifty percent of the borrower entities and the management companies.  He was the managing member of the management companies prior to his split with Edwards in late-2015.  Since the split, Barker has not been involved with managing the facilities or receiving payments.

**III.     JURISDICTION AND VENUE**

44.     This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d), as the aggregate amount in controversy exceeds $5,000,000; at least one member of the Class is a citizen of a state different from Defendant BOKF; and more than one third of all Class

members reside outside of the State of Oklahoma.  Defendant BOKF oversaw the solicitation of potential investors in the fraudulent scheme described herein in numerous states across the country.

45.     Venue is proper in this District under 28 U.S.C. § 1391 because Defendant BOKF has its corporate headquarters in this District, and Defendant BOKF maintained such corporate headquarters in this District at all times material to this action.

## IV.     FACTUAL ALLEGATIONS

**A.     Background and Structure of the Edwards Offerings**

46.     Edwards and Barker raised approximately $62 million through the Edwards Offerings, which they claimed were for building, purchasing, or otherwise acquiring and renovating senior housing facilities.  Their nine offerings occurred from July 2014 through September 2015.

47.     On eight of the nine offerings, Edwards and Barker executed a guarantee agreement with which they personally guaranteed prompt payments of interest and principal.

48.     Edwards and Barker were each fifty percent owners of the limited liability companies that served as borrowers for the Edwards Offerings and of the management companies used to oversee and manage the various facilities related to the Edwards Offerings. Edwards was the managing member of the borrower entities, and Barker was the managing member of the management companies.

49.     Edwards, as the managing member of the borrower entities, was the primary contact person for the members of his financial team.  He was also the one primarily providing the information related to the borrower entities and the Edwards Offerings (i.e., the facility's forecasted budget, the purchase price, and the specific uses for the proceeds).  Edwards signed all

of the documents related to the Edwards Offerings on behalf of the borrower entities; such documents included, among others, the official statements and the loan agreements.

50.     Edwards and Barker used their limited liability companies as the borrower entities for each of the nine Edwards Offerings.  According to the offering documents, the borrower entities (established and controlled by Edwards and Barker) were obligated to make interest and principal payments to the investors.  Further, the borrower entities pledged the acquired senior housing facility and revenues generated by the facility as collateral for the particular Edwards Offering.  The offering documents also required the creation of a capitalized interest fund and a DSRF at the related trustee bank, which included Defendant BOKF.

51.     The capitalized interest fund would be used to make bond payments from the beginning of the offering until the acquisition, construction, or renovation of the related facility was completed.  On the other hand, as noted, the DSRFs were to be used for bond payments *only* when there were no other funds available to make those payments.  And in the event of a draw down on any of the DSRFs, the borrower was obligated to replenish the drawn down amount in twelve equal monthly payments.

52.     In the Edwards Offerings, the proceeds from the bond sales were supposed to be used for specific projects, such as the acquisition or renovation of a facility for the benefit of the borrowing entity, and the borrower was required to make the debt service payments to investors through the trustee banks.  The borrower entity pledged the facility and its revenues as security for the bonds.  Some of the Edwards Offerings (e.g., the Montgomery Offering) were structured so that the municipal authority issuer leased the facility to the borrower entity with the borrower thereby becoming a lessee.  In other cases (e.g., the Columbus Offering), the borrower entity and the municipal authority entered into a loan agreement.

53.     Edwards and Barker eventually became involved in a business dispute in or about December 2015.  As a result, Edwards locked Barker out of OSL.  Barker has not been involved with the facilities since the lock out.

**B.      The Official Statements for the Edwards Offerings**

54.     The Edwards Offerings' official statements disclosed to existing and prospective investors that the revenues generated by the senior housing facilities would be used to pay the expenses of the underlying facility and the bond payments due to the investors.  The official statements do not authorize the use of revenues from the underlying facility for the expenses of other facilities.  They also do not authorize the commingling of revenues and proceeds from the different facilities and Edwards Offerings.  In fact, the loan agreements (which are part of the official statements) indicate that the borrower entity has specifically promised not to commingle funds with other entities or to provide loans to any third parties.

55.     Further, the loan agreements obligate the borrower entities to submit the revenues generated by the facility to the trustee banks in amounts sufficient to make the following payments (in order of priority): (1) the next interest payment that would not be coming from the capitalized interest fund; (2) a portion of the next principal payment; (3) a portion of the facility's ad valorem taxes; (4) replenishment of the DSRF; and (5) management fees.

56.     The loan agreements provided monthly management fees of up to six percent. However, as noted, the payment of management fees was not to occur until the other, higher-priority payments were made.

57.     The official statements also noted the sources and uses of the funds raised in connection with the Edwards Offering.  As was the case with Brogdon and Edwards, the source

of the funds for each offering was the proceeds raised from the investors.  The uses included acquiring, constructing, or renovating the facility, the capitalized interest fund, and the DSRF.

58.     Some of the offerings provided for a working capital fund, which was to be used for handling the daily operations of the underlying facility.

## C.     Edwards' Fraudulent Activity

### 1.     The Commingling of Revenues and Funds

59.     Edwards began commingling facility revenues (in violation of the offering documents) in September 2014—just days after he closed his second offering in August 2014. He would commingle the funds by electronically transferring funds or writing checks (he signed the majority of checks written out of the accounts connected to OSL).  Edwards continued this activity as he closed on each of the other seven Edwards Offerings.  He was also continuously commingling the facilities' working capital funds.

60.     Edwards continued commingling revenues and funds even after he split with Barker in late-2015, but he set up a new entity, Manor House.  He continued his practice of commingling funds through at least November 2016.  Overall, OSL and Manor House received over $3.5 million from various facility accounts between September 2014 and November 2016. During that period, OSL and Manor House also transferred nearly $1.5 million back to the various facility accounts.  Edwards and Barker used another $2 million for other expenses, both business and personal, and for funding additional bond offerings and facility purchases.  And finally, Edwards transferred funds between the various facility accounts, without going through OSL or Manor House, in amount totaling approximately $430,000.  Some of these transfers were referred to as "loans," but there is no evidence or documentary support for the loans—and more importantly, such "loans" were precluded by the loan agreements.

61.     Edwards misled investors and failed to disclose that their investments were funding all of the facilities from all nine of the Edwards Offerings instead of just the one facility connected to the Edwards Offering in which they invested.  Edwards characterized this practice as taking from the "strong sisters" and giving to the "weak sisters."

62.     Edwards specifically admitted to commingling funds in violation of the bond offering documents.  After locking out Barker, Edwards hired a management company to manage eight of the facilities.  Edwards instructed the management company to continue commingling revenues.  For example, he told the management company that they would need to use funds from the "strong sisters" to support the Opelika Facility.  The Opelika Facility was located in Alabama along with the Waterford Facility and the Montgomery Facility. Importantly, due to a failed inspection, Edwards had lost his license to operate senior housing facilities in Alabama.

### 2.     The Misuse of Revenues and Funds

63.     Edwards and Barker used the facility revenues and working capital funds, which were improperly commingled, to conduct new bond offerings and to purchase new facilities. They consistently misused the revenues and funds in this manner between July 2014 and December 2015.  During that time, Edwards and Barker used commingled funds totaling more than $430,000 (another $54,000 came from Susan Edwards in December 2015).

64.     OSL would spend commingled funds to assist with new bond offerings and the purchase of new facilities.  When the offering closed, OSL received a reimbursement for the commingled funds.  Consequently, when an offering failed to close or fell through, OSL did not receive any reimbursements and the commingled funds were ultimately forfeited.

65.     In September 2015, Edwards and Barker used funds to cover the expenses for five potential bond offerings.  The underwriters on those potential bond offerings were the same underwriters who had assisted Brogdon.  The SEC began investigating Brogdon (in connection to the offerings involving those underwriters), which resulted in delays for the five potential bond offerings.  Eventually, the potential offerings fell apart, and the commingled funds used to finance those offerings were forfeited.

### 3.     The Misappropriation of Revenues and Funds

66.     Not only did Edwards and Barker misuse facility revenues and funds, they also misappropriated the revenues and funds for personal benefit and gain—Edwards received approximately $396,000 and Barker received $225,000.

67.     Many of the checks written to them included a descriptive notation, like "rent" or "management fees," but a significant portion of those payments exceed the amounts actually owed to Edwards and Barker.  In fact, the official statements did not authorize them to take rent or lease payments from facility revenues generated after the closing of the offering and the acquisition of the facility.  Such payments represented revenue of the facility and were to be used in accordance with the purposes specified in the offering documents.  Further, management fees could only be paid after all higher-priority payments had been made.  In 2016, Edwards took management fees from seven of the Edwards Offerings despite making payments to investors out of the offerings' DSRFs—importantly, this activity occurred after his meeting with Defendant BOKF in December 2015.

68.     Edwards and Barker specifically used the funds they misappropriated to, among other things, pay off corporate credit card bills, purchase cars and jewelry, and make rent payments on a house near the offices of OSL.

### 4.      The Payments of Proceeds and Commingled Revenues to SDH Design, LLC

69.      Edwards submitted requisitions to the various trustee banks, including Defendant BOKF, seeking reimbursements for work allegedly done by SDH Design, LLC ("SDH Design"). The invoices submitted with the requisitions often contained only one-word descriptions of the work done or the materials provided, but the trustee banks, including Defendant BOKF, disbursed proceeds for such claims totally approximately $759,000.  SDH Design had not earned at least a portion of these payments.

### 5.      The Facilities' Payables

70.      In April 2016, Edwards told his new management company that all of the facilities were current on their payables.  In May, the management company discovered that was not true as it began receiving unpaid invoices that dated all the way back to November and December 2015.  The management company also learned that property taxes were delinquent and due.  Paying off these old invoices depleted the facilities' operating revenues.

### D.      Defendant BOKF's Involvement with Edwards

71.      At all relevant times, Defendant BOKF had a conflict of interest with regard to the Edwards Offerings.  BOKF served as Trustee for six Edwards Offerings—the proceeds from five of the Edwards Offerings were used to pay off prior Brogdon Offerings (which were secured by the same facility).[1]  When it agreed to be Trustee for the Edwards Offerings, Defendant BOKF, through its management and employees, had breached various obligations in the Brogdon Indenture and in the Brogdon Offering Statements.  Further, Defendant BOKF had colluded with, and improperly consented to, Brogdon's failure to abide by his obligations in the related

---

[1] It is unclear from the publicly available information in the SEC's investigation of Edwards which of the six was not a prior Brogdon Offering.

indenture and offering statements by secreting the fact that his facilities were in dire financial straits, were violating the terms of the indenture, and were misusing the investors' funds.

72.     Defendant BOKF hoped that with Edwards' payoff of Brogdon's outstanding bonds, all of Brogdon's and Defendant BOKF's misdeeds would be resolved and forever hidden. Indeed, the SEC's investigation revealed that at the time Brogdon's outstanding bonds were paid off, these bonds had a cumulative DSRF deficiency of $822,567.34.  However, in an effort to "hide its sins," Defendant BOKF breached its duties to Edwards' bondholders in the same manner as when it remained silent in the face of Brogdon's transgressions or, on other occasions, actively colluded with Brogdon.

73.     Defendant BOKF reviewed the offering documents pre-closing and pre-posting on the Municipal Securities Rulemaking Board's Electronic Municipal Market Access ("EMMA").  Defendant BOKF failed to disclose in those documents (1) the dire financial straits of the Brogdon facilities, which had motivated Brogdon to sell; (2) that the moneys raised from the offering would pay off prior bondholders of an entity that had already breached its indenture obligations; and (3) that it had remained silent in the face of Brogdon's transgressions or, on other occasions, actively colluded with Brogdon (i.e., by aiding his financial misdeeds and violations of the indenture and offering documents).

74.     Edwards testified in his deposition before the SEC that neither Defendant BOKF nor Lawson Financial or Cantone Research ever mentioned the prior DRSF deficiencies of Brogdon's facilities to Edwards.  Further, Edwards testified that he would have expected such information from Defendant BOKF.  Obviously, such information was even more critical to prospective bondholders.  Edwards testified that if Brogdon had drawn down a DSRF and not replenished it, that would have been important for bondholders to know.  As noted above,

Brogdon repeatedly drew on the DSRFs of the facilities that Edwards would later buy, but such was never disclosed to either Brogdon's current investors or Edwards' prospective investors.

75.     The failure of Defendant BOKF to disclose material information about Brogdon's violations of his obligations under the indenture and offering statements also included the nondisclosure of Brogdon's failure to file financial statements.  For example, Brogdon had not filed financial statements for 2012 or 2013 for the bond offering involving the Rome Facility. When Edwards financed his acquisition of the Rome Facility from Brogdon, the offering statement did not disclose the aforesaid failure to file financial statements.  As another example, Brogdon had not filed financial statements for 2013 for his Savannah Facility, and this fact was not disclosed in the offering statement for Edwards' purchase of the Savannah Facility. Defendant BOKF knew of these failures to file financial statements but did not seek to have such information disclosed in the offering statements provided to Edwards' prospective investors.

76.     From the SEC's investigation as to Defendant BOKF's aid and/or acquiescence to Brogdon's wrongdoing, Defendant BOKF had knowledge of the problems caused when a trustee bank does not perform its function as a trustee properly by not requiring financial statements from the borrower and by allowing the borrower to otherwise breach its obligations to bondholders—yet Defendant BOKF continuously remained silent regarding the misdeeds of Edwards.  For example, with regard to the Columbus Facility, Defendant BOKF did not require the facility's financial statements for 2015 to be posted on EMMA until *after* the facility was in receivership.  It was not until August 1, 2016, that Defendant BOKF posted on EMMA a "Failure to File Annual Information" for the Columbus Facility.  The financial statements were finally posted on September 27, 2016.  Defendant BOKF thus permitted Edwards to engage in

wrongdoing for over a year post-closing.   Similar activity occurred in relation to the other Edwards Offerings involving Defendant BOKF.

77.     For the Edwards' facilities, Defendant BOKF did not collect monthly management fees from the facilities' revenues and then remit them to the management company—a violation the indenture and offering documents.   Defendant BOKF knew that the official documents (either the loan agreement or the lease agreement) required that there would be a monthly management fee.   Each loan agreement or lease agreement signed by the borrower and attached to the offering provides that the borrower will remit monthly to the trustee bank an amount adequate for the trustee bank to pay to the management company the management fee for the forthcoming month, but the failure of the borrower to remit to the trustee bank an amount adequate for the trustee bank to make all or any part of such management fee shall not constitute an event of default if and to the extent that such failure resulted from an insufficiency in gross revenue.   As noted above, the trustee bank's duty was to post events of default on EMMA. Defendant BOKF could not determine whether there was an event of default because it totally abdicated its responsibility to collect money from the borrower for management fees and never made any determination of whether there was gross revenue sufficient to pay management fees.

78.     There were other red flags that the facilities were not being properly managed. Terry Maxey ("Maxey") of Defendant BOKF's Corporate Trust Department testified before the SEC that she was concerned by the "requisitions" submitted by Edwards for SDH Design—an entity controlled by Edwards.   One such requisition was for over $19,000 worth of carpet, which Maxey referred to as "quite a bit for carpeting a facility."   And further, Defendant BOKF was often unable (1) to write a check for the funds transmitted by Edwards, (2) make debt service payments, or (3) replenish a DSRF because there were insufficient funds in Edwards' accounts.

79.     There were additional red flags related to the Edwards Offerings that were not disclosed to investors for months.  For example, there was a meeting at Defendant BOKF in Tulsa, Oklahoma, on December 15, 2015, attended by Edwards, his lawyer, Campbell, Maxey, Wilkinson, and James Higgins (i.e., counsel for Defendant BOKF).  At the meeting, Edwards submitted a proposal to Defendant BOKF that four of Edwards' facilities (Savannah, Columbus, Waterford and Gainesville) be permitted to draw down on the DSRFs for each Edwards' facility. Maxey testified before the SEC that this was the first meeting she ever attended where a bond borrower was proposing a multi-facility debt service draw down.  Maxey further testified that prior to this meeting, Defendant BOKF was aware that Edwards had used personal funds to make debt service payments on these four facilities.  At that meeting, Defendant BOKF also failed to raise or inquire into the absence of Barker—who was, as noted herein, the fifty percent owner of all the entities that are the subject of this action.

80.     Further, at the meeting on December 15, 2015, Edwards' draw-down proposal showed monthly deficits at the Savannah, Columbus, Waterford, and Gainesville Facilities but nevertheless proposed to draw from the DSRFs approximately $10,000 more than the monthly deficit amount.  Defendant BOKF did not question Edwards on why he needed to draw so much more than an amount necessary to satisfy the deficit and, in any event, agreed to the draw-down proposal.

81.     Also, at the meeting on December 15, 2015, the attendees discussed that the indenture and offering documents contained a lockbox feature whereby Defendant BOKF could require that all revenue from the Savannah, Columbus, Waterford, and Gainesville Facilities be directly placed in accounts at Defendant BOKF.  In a January 2016 e-mail from Defendant

BOKF's counsel (Higgins) to Edwards' counsel (Travers Payne), Higgins wrote that he did not "believe a lockbox would be practical or necessary in this situation."

82.     As with Brogdon's facilities, Defendant BOKF disregarded its duties as Trustee—continuing to ignore the various types of red flags discussed herein.  Defendant BOKF continued to do so until Brogdon's and Edwards' fraudulent schemes began to collapse, beginning in late-2015 when the SEC sued Brogdon on November 20, 2015.  Edwards was still using commingled revenues and funds around that time, and he continued to draw down on DSRFs until August 2016—when Defendant BOKF *finally* declared a default on the bonds and began searching for receivers.

83.     In September 2016, in SEC Administrative Proceeding No. 3-17533, in order to settle SEC charges related to the aforesaid aid and/or acquiescence to Brogdon's wrongdoing, Defendant BOKF agreed to (1) disgorge $984,200.73 of fees collected, (2) pay $83,520.63 in interest, and (3) pay a $600,000 fine.  Notably, although the aforesaid settlement with the SEC was per a non-admission clause, the SEC found that Defendant BOKF's Corporate Trust Department employees knew that deficiencies regarding Brogdon's offerings would impact Brogdon's ability to be a borrower in future offerings and/or negatively impact Lawson Financial's ability to underwrite new offerings for Brogdon.  Similarly, Defendant BOKF's Corporate Trust Department employees knew that Edwards' deficiencies would negatively impact Edwards' future deals and thereby affect commissions and revenue for the Corporate Trust Department.

84.     As noted herein, the SEC sued Edwards and Barker (and several related entities) on January 20, 2017, for the same or substantially similar fraudulent activity for which it had previously sued Brogdon in November 2015.

85.     Edwards and Barker's Ponzi-like scheme defrauded investors out of approximately $62 million.

## V.     CLASS ACTION ALLEGATIONS

86.     This action is brought by the Plaintiffs, individually and on behalf of all others similarly situated, as a class action pursuant to FED. R. CIV. P. 23(a) and (b)(3).

### A.     Class Definition

87.     The proposed Class (the "Class") is defined as follows:

> All persons and entities that purchased, or otherwise acquired, conduit municipal bonds sold by Dwayne Edwards and Todd Barker controlled entities, and for which BOKF served as Trustee.

88.     Excluded from the Class are (1) Defendant BOKF; (2) any person, firm, trust, corporation, or other entity related to or affiliated with Defendant BOKF; (3) any underwriter of bonds sold by Edwards and Barker controlled entities; and (4) any judge or judicial officer who may hear any aspect of this case and his or her law clerks.

### B.     Numerosity

89.     The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable.  While the exact number of Class members remains unknown at this time, it is estimated that the Class includes well in excess of 1,000 individuals who reside across the United States.  The exact number of the Class members is within the knowledge of Defendant BOKF and/or the SEC.

### C.     Commonality

90.     There are common questions of law and fact in this class action that relate to and affect the rights of each member of the Class, including, *inter alia*:

> a.  Whether the Edwards Offerings were integrated into a single offering;

b.  Whether the Edwards Offerings were fraudulent;

c.  Whether the Edwards investor's money was commingled in the various Edwards accounts;

d.  Whether Edwards defrauded the investors, misused (converted) their money, and/or commingled investment proceeds from different investment programs;

e.  Whether the Edwards Offerings were a Ponzi scheme;

f.  Whether BOKF, as Trustee, owed duties to the members of the Class;

g.  Whether BOKF was a fiduciary as to the Class members money it held in its accounts;

h.  Whether BOKF breached duties owed to Plaintiffs and the Class by failing to conform its conduct to the requirements of the law, and applicable regulations;

i.  Whether BOKF disregarded red flags indicating that Edwards was misusing and commingling investor money and/or using such money for Ponzi-scheme payments;

j.  Whether BOKF new that Edwards was misusing and commingling investor money and/or using such money for Ponzi-scheme payments;

k.  Whether BOKF knowingly provided substantial assistance to Edwards;

l.  Whether BOKF was grossly negligent in its oversight of Edwards bond trust accounts;

m. Whether BOKF's misconduct entitles Plaintiffs and members of the Class to damages for the loss of the amounts invested by Plaintiffs and members of the Class;

n. What remedies are appropriate compensation for the damages caused to the Plaintiffs and each member of the Class; and

o. Whether the Plaintiffs and members of the Class are entitled to a reasonable award of attorneys' fees, interest and costs of suit.

**D.    Typicality**

91.    The claims of the Plaintiffs are typical of all members of the Class.  The claims of the Plaintiffs are based on the same fundamental factual allegations and legal theories as the claims of all other members of the Class.  The Plaintiffs are situated identically to all members of the Class with respect to issues presented in this case, as the Plaintiffs and all members of the Class were investors in the Edwards Offerings and suffered the exact same type of loss (in proportion to their investment).  While some of the Plaintiffs invested in ostensibly separate and various Edwards Offerings, in reality, as stated above, their money was commingled, the Edwards Offerings were integrated, and the Plaintiffs are investors in the same offerings, as are all other investors in the scheme perpetrated by Edwards (as described above).

92.    All Class members' funds have been adversely affected by the wrongdoing of Defendant BOKF, as described herein.

**E.    Adequacy of Representation**

93.    The Plaintiffs will adequately represent and protect the interests of the Class and have no interests that conflict with or are antagonistic to the interests of the Class.

94.    The Plaintiffs have retained attorneys who are experienced in, and capable of prosecuting, complex class actions such as this case.  The attorneys for the Plaintiffs and the Class will actively conduct and be responsible for the prosecution of this litigation and the

expenses thereof.  The attorneys for the Plaintiffs and the Class have adequate resources, experience, and commitment to litigate this matter.

95.     A class action is superior to any other method available for the fair and efficient adjudication of this controversy because it would be impractical and undesirable for each of the individual Class members who have suffered damages to bring separate actions.  Some investors invested amounts in the Edwards Offerings that would make it impracticable for them to litigate individualized securities fraud cases concerning this matter.  Moreover, the common issues identified above predominate over individual issues, if any, particular to each class member.  The scheme perpetrated by Edwards was carried out through conduct common and uniform to all members of the Class.

**FIRST CAUSE OF ACTION**
**(Aiding and Abetting Fraud)**

96.     Plaintiffs adopt and incorporate by reference the preceding Paragraphs 1-95.

97.     As set forth above, Edwards and Barker were engaged in a fraudulent scheme in which they knowingly made material misrepresentations and omissions to bond investors, both existing and prospective, that the proceeds of the Edwards Offerings would be deposited in trust accounts with the Trustee, Defendant BOKF.  They also misrepresented that the proceeds of the Edwards Offerings would be used only for the purposes stated in the offering documents.  Further, investors were told that the revenues generated by the underlying facilities were to be used for, among other things, making debt payments owed to the investors.  Edwards and Barker did not follow through on any of these assurances.  Instead, the proceeds, revenues, and funds were commingled and used for purposes other than those stated in the offering documents.

98.     Edwards and Barker were financially irresponsible, often making interest and principal payments out of the DSRFs.  Essentially, Edwards and Barker misled the bondholders

into believing that their investments were being used properly and that their bond program was in good operating order. The lack of required financial statements further hid the misdeeds of Edwards and Barker.

99.     The misrepresentations and omissions were material to people investing in the Edwards Offerings. Further, Edwards, Barker, and the other entities participating in their fraudulent scheme, like Defendant BOKF, intended for the investors to rely upon their misrepresentations and omissions, which is exactly what happened. In this case, the investors relied to their detriment upon the fraudulent misrepresentations and omissions made by Edwards, Barker, and Defendant BOKF.

100.    Defendant BOKF provided substantial assistance to Edwards and Barker. It plainly ignored a major conflict of interest and failed to notify investors that the facilities being acquired by Edwards and Barker were being sold by Brogdon. Defendant BOKF never disclosed Brogdon's financial status, his violations of the indenture, or his misuse of investor funds. Further, Defendant BOKF did not require financial statements from the borrowers (owned and controlled by Edwards and Barker) and otherwise allowed those borrowers to breach their obligations to the investors. Defendant BOKF also did not collect monthly management fees—a violation of the offering documents. It ignored countless red flags denoting mismanagement and failed to apprise investors of material developments related to Edwards and Barker. Defendant BOKF also processed draws from the DSRFs—accounts that were to be maintained by the trustee bank for the benefit of the bondholders, not Edwards or Barker. Defendant BOKF also failed to ensure that funds were being used for the stated purposes.

101.    Defendant BOKF was aware of its role in the fraudulent scheme orchestrated by Edwards and Barker—a role remarkably similar to the one it played for Brogdon. Defendant

BOKF's assistance in this fraudulent scheme and its misconduct directly and proximately caused the losses suffered by the Plaintiffs and the Class.  Specifically, Defendant BOKF's actions resulted in the misuse and misappropriation of their investments.  Plaintiffs and the Class have suffered injuries and damages in an amount in excess of $5,000,000.

### SECOND CAUSE OF ACTION
#### (Aiding and Abetting Breach of Fiduciary Duty)

102.    Plaintiffs adopt and incorporate by reference the preceding Paragraphs 1-101.

103.    Edwards and Barker were the controlling forces behind each of the borrower entities and each of the Edwards Offerings.   As such, Edwards and Barker owed their bondholders (i.e., investors) certain fiduciary duties.  Further, the investors relied upon them to safeguard their investments.

104.    Edwards and Barker breached the fiduciary duties they owed to the investors by defrauding those investors out of millions of dollars.  Further, Edwards and Barker misused and misappropriated the bondholders' investments and continued to mislead the investors by failing to disclose important information and by making material misrepresentations and omissions.

105.    As noted herein, Defendant BOKF was aware of the various breaches of fiduciary duty but continued to provide substantial assistance to Edwards and Barker—aiding and abetting in the breach of the fiduciary duties owed to their investors.  Defendant BOKF was at all times aware of its role in this fraudulent scheme—a role that mirrored the one it played for Brogdon.  Defendant BOKF's assistance in this fraudulent scheme and its misconduct directly and proximately caused the losses suffered by the Plaintiffs and the Class.  Specifically, Defendant BOKF's actions resulted in the misuse and misappropriation of their investments.  Plaintiffs and the Class have suffered injuries and damages in an amount in excess of $5,000,000.

### THIRD CAUSE OF ACTION
### (Gross Negligence)

106.    Plaintiffs adopt and incorporate by reference the preceding Paragraphs 1-105.

107.    As noted herein, Defendant BOKF knowingly and willingly assisted in the misdeeds of Brogdon.  It nevertheless chose not to disclose his and his facilities' dire financial straits and his numerous violations of the bond offering documents, keeping that information secret from the bondholders investing with Edwards and Barker.  Defendant BOKF was aware of the substantial assistance it was providing to Edwards and Barker—assistance that resembled the assistance it provided to Brogdon.  Specifically, Defendant BOKF ignored an obvious conflict of interest, did not require the filing of financial statement, did not collect monthly management fees, directly ignored red flags suggesting poor management of the facilities, failed to ensure that proper use of revenues and funds, permitted improper transfers, and processed multiple draws on the DSRFs.  Defendant BOKF did not disclose material information to the investors, and it knew that it was helping others perpetrated fraud and breach of fiduciary duties.

108.    Defendant BOKF, as Trustee, owed a duty of reasonable care to the Plaintiffs and the Class—the bondholders who invested with Edwards and Barker.  It had a duty to exercise reasonable care in the protection, maintenance, and use of the investment proceeds.  Further, Defendant BOKF had a continuing duty to disclose important and material information to the bondholders.  As set forth above, Defendant BOKF breached these duties that it owed to the Plaintiffs and the Class.

109.    Defendant BOKF's misconduct rises above a mere failure to exercise reasonable care.  Its actions were conscious and extreme in comparison to ordinary negligence.  Defendant BOKF voluntarily disregarded its duty to exercise reasonable care in a manner that was likely to cause foreseeable injury and harm to the Plaintiffs and the Class.  Defendant BOKF knew the

ramifications of its conduct by virtue of the fraud and misconduct perpetrated by Brogdon, which resulted in an investigation by the SEC.  It was thus more than reasonably foreseeable that its conduct would cause injury and harm to the Plaintiffs and the Class.  Defendant BOKF nevertheless continued engaging in the same or similar conduct for Edwards and Barker.

110.    The Plaintiffs and the Class, as bondholders, trusted their investment to Defendant BOKF, but Defendant BOKF permitted their investment to be misused and misappropriated by Edwards and Barker.  In other words, Defendant BOKF's assistance in this fraudulent scheme and its misconduct directly and proximately caused the losses suffered by the Plaintiffs and the Class.  Defendant BOKF's actions resulted in the misuse and misappropriation of their investments.  Plaintiffs and the Class have suffered injuries and damages in an amount in excess of $5,000,000.

## FORTH CAUSE OF ACTION
### (Negligence)

111.    Plaintiffs adopt and incorporates by reference the preceding Paragraphs 1-110.

112.    Defendant BOKF's conduct was negligent in the alternative.  As described above, Defendant BOKF owed a duty a reasonable care and a duty of disclosure to the Plaintiffs and the Class.  It breached these duties.

113.    Defendant BOKF's misconduct is, at the very least, a failure to exercise reasonable care.  It disregarded and breached its duty to exercise reasonable care in a manner that was likely to cause foreseeable injury and harm to the Plaintiffs and the Class.  Defendant BOKF knew the ramifications of its conduct by virtue of the fraud and misconduct perpetrated by Brogdon, resulting in an investigation by the SEC.  It was thus more than reasonably foreseeable that its conduct would cause injury and harm to the Plaintiffs and the Class.  Defendant BOKF nevertheless continued engaging in the same or similar conduct for Edwards and Barker.

114.    Defendant BOKF's misconduct, as described herein, was a negligent breach of the duties it owed to the Plaintiffs and the Class.  Further, its assistance in this fraudulent scheme and its misconduct directly and proximately caused the losses suffered by the Plaintiffs and the Class.   Defendant BOKF's actions resulted in the misuse and misappropriation of their investments.  Plaintiffs and the Class have suffered injuries and damages in an amount in excess of $5,000,000.

## FIFTH CAUSE OF ACTION
### (Breach of Fiduciary Duty)

115.    Plaintiffs adopt and incorporate by reference the preceding Paragraphs 1-114.

116.    As noted herein, Defendant BOKF served as Trustee on six of the nine Edwards Offerings.  Defendant BOKF, as Trustee, had a fiduciary relationship with—and thus owed the duties of good faith, loyalty, care, and disclosure to—the Plaintiffs and the Class.  It violated that fiduciary relationship and breached those fiduciary duties.

117.    Defendant BOKF was responsible for, among other things, protecting and overseeing the investment proceeds, ensuring that revenues and funds were being used properly and in accordance with their stated purposes, requiring and reviewing financial statements, guarding against and securing any deficiencies, and declaring default as soon as any actions triggering a default occurred.  Further, Defendant BOKF was responsible for disclosing to the investors, among other things, events of default, uses of funds not in accordance with their stated purpose, and important and material information related to the investment and/or the bond program—including information about the individuals running the bond program, such as the split between Edwards and Barker, and information about the facilities being acquired (i.e., that they were from Brogdon).  As explained throughout, Defendant BOKF did not adhere to these

responsibilities.  Defendant BOKF was also, at all relevant times, ignoring a major conflict of interest between its involvement with Brogdon and its involvement with Edwards and Barker.

118.   Defendant BOKF's misconduct, failure to adhere to its responsibilities as Trustee, and its blatant conflict of interest resulted in a breach of its fiduciary duties of good faith, loyalty, care, and disclosure.  Its assistance in this fraudulent scheme and its misconduct directly and proximately caused the losses suffered by the Plaintiffs and the Class.  Defendant BOKF's actions resulted in the misuse and misappropriation of their investments.  Plaintiffs and the Class have suffered injuries and damages in an amount in excess of $5,000,000.

### SIXTH CAUSE OF ACTION
### (Civil Conspiracy)

119.   Plaintiffs adopt and incorporate by reference the preceding Paragraphs 1-118.

120.   Defendant BOKF entered into a conspiracy to perpetrate this illegal and fraudulent scheme with Edwards and Barker.  Defendant BOKF was intimately involved in the misdeeds and fraudulent activity of Brogdon, and it kept that and other material information secret in an attempt to continue the same or similar scheme with Edwards and Barker.

121.   Defendant BOKF, through the actions of its employees, worked with Mr. Lawson to solicit business from Edwards and Barker while it was still helping further the fraudulent activity of Brogdon.  Instead of protecting investors (i.e., the Plaintiffs and the Class), Defendant BOKF and its employees were more interested in receiving commissions and other types of compensation as well as covering up their involvement with Brogdon.

122.   As noted herein, Defendant BOKF agreed to serve as Trustee for a majority of the Edwards Offerings while in the midst of breaching various obligations and colluding with, and improperly consenting to, the misdeeds of Brogdon.  Defendant BOKF should have notified the bondholders investing with Edwards and Barker that the facilities were being acquired from

Brogdon, and it should have disclosed the dire financial straits, violations of the indenture terms, and misuse of investor funds related to Brogdon. Instead, Defendant BOKF withheld this information in hopes that Edwards and Barker's payoff of Brogdon's outstanding bonds would resolve the misdeeds of Brogdon and Defendant BOKF.

123.   Defendant BOKF thus actively concealed important and material information from the investors in an attempt to further the activities of Edward and Barker. Defendant BOKF endeavored to create the appearance of sound bond programs in hopes of continuing this fraudulent scheme. It ignored an obvious conflict of interest, did not require the filing of financial statement, did not collect monthly management fees, directly ignored red flags suggesting poor management of the facilities, failed to ensure that proper use of revenues and funds, permitted improper transfers, and processed multiple draws on the DSRFs. Defendant BOKF did not disclose this or other material information to the investors, and it knew that it was helping others perpetrated fraud and breach of fiduciary duties.

124.   Defendant BOKF was content to ignore and withhold these issues to continue its business and relationship with Edwards and Barker. Its assistance in this fraudulent scheme and its misconduct directly and proximately caused the losses suffered by the Plaintiffs and the Class. Defendant BOKF's actions resulted in the misuse and misappropriation of their investments. Plaintiffs and the Class have suffered injuries and damages in an amount in excess of $5,000,000.

### SEVENTH CAUSE OF ACTION
#### (Violations of the Georgia Blue Sky Law)

125.   Plaintiffs adopt and incorporate by reference the preceding Paragraphs 1-124.

126.   Under the Georgia Uniform Securities Act of 2008 ("Georgia Blue Sky Law"), a person is liable to the purchaser of a security when that person offers or sells a security in

violation of GA. CODE ANN. § 10-5-20 or "by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statement made, in light of the circumstances under which it is made, not misleading." GA. CODE ANN. § 10-5-58(b).

127.     Further, "[t]he following persons are liable jointly and severally with and to the same extent as persons liable under subsection[] (b) . . . (3) [a]n individual who is . . . associated with a person liable under subsections (b) through (f) of this Code section and who *materially aids* the conduct giving rise to the liability." *Id.* § 10-5-58(g)(3) (emphasis added).

128.     For the above-quoted provisions to be applicable, the person must make the sale or offer to sell in Georgia or the offer to purchase or the purchase is made and accepted in Georgia. *Id.* § 10-5-79(a).  "[A]n offer to sell or to purchase a security is made in [Georgia], whether or not either party is then present in [Georgia], if the offer: (1) Originates from within [Georgia]; or (2) Is directed by the offeror to a place in [Georgia] and received at the place to which it is directed." *Id.* § 10-5-79(c).

129.     The bonds issued in the Edwards Offerings were "securities," as defined by the Georgia Blue Sky Law.  *See id.* § 10-5-2(31).  Further, these offerings originated in Georgia pursuant to the requirements and provisions of GA. CODE ANN. § 10-5-79.

130.     Edwards and Barker engaged in fraudulent activity that violated the Georgia Blue Sky Law because they used material misrepresentations and omissions to sell securities to the Plaintiffs and the Class.  *See, e.g.*, *id.* §§ 10-5-50, 10-5-58(b).  Their offering documents contained numerous misrepresentations and omissions of important and material facts— including, among other things, the use of proceeds and funds, the history of the facilities, and the involvement with and wrongdoing of Brogdon.  The offering documents were issued in such a

manner to entice investors to purchase the offered securities.  Edwards and Barker are thus liable to the Plaintiffs and the Class pursuant to GA. CODE ANN. § 10-5-58(b).

131.    Defendant BOKF was "associated" with Edwards and Barker, and it materially aid[ed] the conduct giving rise to [their] liability" under GA. CODE ANN. § 10-5-58(b)—a direct violation of GA. CODE ANN. § 10-5-58.  *See id.* § 10-5-58(g)(3).

132.    Defendant BOKF's role in this illegal and fraudulent scheme goes beyond "materially" aiding Edwards and Barker.  Defendant BOKF took several independent steps to deceive and mislead existing and potential investors.  It withheld material information related to Brogdon.  It failed to disclose to investors that Edwards and Barker were acquiring the struggling facilities from Brogdon, and it failed to disclose the financial difficulties plaguing both the facilities and Brogdon.  Defendant BOKF even went so far as to withhold important information from Edwards and Barker.  As noted above, Edwards testified before the SEC that Defendant BOKF, Lawson Financial, and Cantone Research never mentioned the DSRF deficiencies connected to Brogdon.  Edwards further testified that he would have expected such information from Defendant BOKF.

133.    Defendant BOKF was actively and materially aiding in the fraudulent scheme to raise money from investors through material misrepresentations and omissions.  The nature of its conduct precludes it from claiming that it did not know or could not have reasonably known about the misdeeds of Edwards and Barker.  Under the Georgia Blue Sky Law, Defendant BOKF is thus jointly and severally liable with and to the same extent as Edwards and Barker.  *See id.* §§ 10-5-58(b), 10-5-58(g)(3).

134.    The Plaintiffs and the Class are entitled to damages from Defendant BOKF Under GA. CODE ANN. § 10-5-58.

## VI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

a.      A determination that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

b.      An award of compensatory damages in favor of the Plaintiffs and the Class for all of the damages sustained as a result of the wrongdoing of Defendant BOFK, in an amount in excess of $5,000,000, including interest thereon.

c.      An award of the reasonable costs and expenses incurred in this action by the Plaintiffs and the Class, including but not limited to expert witness fees, attorneys' fees, filing fees, forum fees, and hearing fees.

d.      Such other and further relief as the Court deems just and proper.

## VII.   DEMAND FOR JURY TRIAL

Under FED. R. CIV. P. 38, Plaintiffs demand trial by jury.

Respectfully submitted,


s/Randall K. Calvert
Randall K. Calvert, OBA #14154
Rabindranath Ramana, OBA #12045
Andrew R. Davis, OBA #32763
CALVERT LAW FIRM
1041 NW Grand Boulevard
Oklahoma City, Oklahoma 73118
Telephone: (405) 848-5000
Facsimile: (405) 607-3070
E-mail: rcalvert@calvertlaw.com
        rramana@calvertlaw.com
        adavis@calvertlaw.com

        -and-

Nicholas J. Taldone, Esq.
9020 Rancho Del Rio Dr., Suite 101
New Port Richey, FL 34655
FBN: 102598
Telephone: (727) 375-0390
Fax: (727) 494-1036
Primary E-mail: taldonelaw@msn.com
Secondary E-mail: taldonenick@gmail.com

*Attorneys for Plaintiffs*

**ATTORNEY LIEN CLAIMED**

## CERTIFICATE OF SERVICE

I hereby certify that on April 3, 2017, I electronically transmitted the attached document to the Clerk of the Court using the ECF System for filing.  A true and correct copy of the foregoing document was certified mailed, restricted delivery to Defendant's Service Agent as follows:  BOKF, d/b/a Bank of Oklahoma, c/o Frederic Dorwart, Service Agent, 124 E. Fourth Street, Tulsa, OK  74013-5027.

s/Randall K. Calvert
Randall K. Calvert