**UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA**

TONY ALMEIDA, et al.,         )
         )
         plaintiffs,         )
         )
v.         )         Case No. 17-CV-126-JED-FHM
         )
BOKF, NA,         )
         )
         defendant.         )

**OPINION AND ORDER**

The Court has for its consideration Defendant BOKF, NA's Motion to Dismiss (Doc. 15).

## I.    BACKGROUND

From July 2014 through September 2015, Dwayne Edwards engineered a series of bond offerings that generated roughly $62 million from investors. Edwards touted the offerings as vehicles to finance the development of senior living facilities in Georgia and Alabama. According to the plaintiffs, the offerings were also vehicles for a fraud that bilked investors out of millions. Ten of the individuals who invested in the Edwards Offerings are now named plaintiffs in this putative class action.

Edwards's alleged fraud, the plaintiffs claim, would not have been possible without the aid, or at least the negligence, of BOKF, the bank serving as indenture trustee on the offerings. The plaintiffs assert that BOKF's role in the bond offerings entailed a duty to look out for investors, but the bank ignored that duty in favor of its own interests.

### A.    BOKF's Role in the Edwards Offerings

BOKF served as the indenture trustee on six of Edwards's nine offerings, conduit financing deals whose structure can be summarized as follows: A local governmental body, such as a housing corporation, would issue municipal bonds on behalf of a limited liability company owned by

Edwards and his business partner, Todd Barker, for the purpose of buying and/or refurbishing a senior living facility in the community.[1] Rather than use the proceeds to develop the facility itself, the government authority would "loan" the bond proceeds to the Borrower LLC, which would then use the money to acquire the target property and carryout the necessary renovations. In exchange for the loan, the Borrower LLC promised to pay off the bonds and gave the government issuer a security interest in the property and its future revenues.[2] The government body would then assign its rights in the loan and the accompanying security interests to BOKF for the benefit of the bondholders.

Three documents (collectively referred to in this opinion as the "Offering Documents") governed each of the offerings. An Official Statement, executed by Edwards on behalf of the Borrower LLC, disclosed the particulars of the development project and was meant to apprise potential bondholders of the risks and benefits of investment. A Loan Agreement, attached to the Official Statement in an appendix and incorporated by reference, established the Borrower LLC's repayment obligations and put rules in place for the Borrower LLC's handling of bond proceeds and project revenues. Finally, a Trust Indenture, also appended to the Official Statement, defined the rights of the bondholders as well as BOKF's duties and powers with respect to the trust estate.[3]

---

[1]     Initially, Edwards and Barker were 50-50 members in the Borrower LLCs and a string of management companies set up to manage the facilities. (Doc. 13 ¶ 42–43). Edwards helmed the Borrower LLCs, and Barker the Management LLCs. At some point, however, the two had a falling out and Edwards formed new entities to take over management. (*Id.* ¶ 43).

[2]     On two of the deals, the local government entity held title to the facility and leased it to the associated Edwards LLC. For these offerings, the Borrower LLC's obligations were established in a lease agreement rather than in a Loan Agreement. For simplicity's sake, the Court refers to all the agreements generically as "Loan Agreements."

[3]     Because the Offering Documents are central to the plaintiffs' claims and referred to throughout their complaint, the Court may consider them for the purpose of resolving BOKF's Motion to dismiss. *See Pace v. Swerdlow*, 519 F.3d 1067, 1072 (10th Cir. 2008). BOKF has

The combined effect of the Offering Documents was (1) to make the Borrower LLCs responsible for debt service on the bonds, even if the government issuer remained the nominal obligor, and (2) to impose certain restrictions on the Borrower LLCs with respect to the handling of bond proceeds and project revenues. The Official Statements disclosed that each month, a Borrower LLC would remit to BOKF the money necessary to cover the upcoming interest payment, any principal or sinking-fund payments, property taxes, and, if any revenue remained, a management fee, which BOKF was to forward to a management company owned and controlled by Edwards and Barker. (Doc. 15-10 at 31).  Additionally, a Borrower LLC promised in its Loan Agreement to use bond proceeds only for eligible expenses and to periodically submit operating budgets and financial statements to BOKF.[4] A Borrower LLC also had continuing disclosure obligations that required it, upon the occurrence of certain "Material Events" effecting its credit worthiness, to post notices on the Electronic Municipal Market Access ("EMMA") website. (Doc. 15-10 at 53). Failure to comply with such obligations could trigger a "lockbox" provision that would require a Borrower LLC to forward its gross revenues directly to BOKF. So long as a

---

attached the Official Statements (Docs. 15-7 to 15-12) and Trust Indentures (Docs. 15-1 to 15-6) to its Motion, but it did not provide the Loan Agreements. The Court therefore takes judicial notice of the Loan Agreements, which are publicly available through the Electronic Municipal Market Access ("EMMA") website, www.emma.msrb.org, using the CUSIP numbers associated with each series of bonds.

The Official Statements, Loan Agreements, and Trust Indentures are the same in most material respects across all six offerings at issue in this litigation. Rather than clutter the opinion with redundant citations when discussing a particular provision, the Court cites to a representative example rather than to all six versions of the provision across the relevant documents.

[4]     *See, e.g.*, Columbus Loan Agreement §§ 3.3, 5.4, *reprinted in* Appendix A to the July 24, 2015 Official Statement for the bonds issued under, CUSIP Nos. 19912HFH7, 19912HFJ3, 19912FK0, http://emma.msrb.org/ER907458-ER708910-ER1110424.pdf.

borrower LLC abided by its Loan Agreement, however, it was entitled to collect its own revenues and deposit them in an "Operating Account" it controlled. (Doc. 15-10 at 31–32).

Although BOKF, by way of the Indentures, agreed to accept the issuers' interests in the Loan Agreements, the bank disclaimed nearly all responsibility for policing the Borrower LLCs' compliance with the obligations described above.[5] Instead, BOKF's duties under the Indentures were largely limited to administering various funds housing the bond proceeds and revenues dedicated to each project. The most important of these, for the purposes of this litigation, were the Debt Service Reserve Funds ("DSRF"). After an offering closed, most of the proceeds were available in a Project Fund to be requisitioned by the Borrower LLCs for eligible expenses, but a portion was set aside and placed in a DSRF as further security for bondholders. (Doc. 15-4 §§ 602–03, 606). In the event project revenues were insufficient to cover debt service payments, BOKF was to pay investors from the reserve fund. (Doc. 15-4 § 606). If a draw on the DSRF proved necessary, the Loan Agreements obliged a Borrower LLC to replenish the fund in 12 equal installments over the following year. (*Id.*).

According to the Plaintiffs, Edwards and Barker ignored their obligations, improperly commingling $3.5 million in facility revenues and bond proceeds from different projects. (Doc. 13 ¶ 60). Of that amount, they used about $2 million to fund additional offerings and facility purchases, to pay management fees to which they were not entitled, to pay for renovation work that may never have been done, and to otherwise enrich themselves at the expense of bondholders. (*Id.* ¶¶ 60–69). The plaintiffs claim that BOKF was in a position to stop these violations but chose not to because its own financial interests were served by keeping Edwards and Barker afloat.

---

[5]     The relevant disclosure provisions are discussed in detail *infra*.

### B.     The Brogdon Connection

Prior to becoming involved with Edwards, BOKF had a longstanding business relationship with a man named Christopher Brogdon, who was also in the business of buying and redeveloping senior living facilities using conduit financing arrangements. (Doc. 13 ¶ 2–5). The terms of his deals were similar to those governing the Edwards Offerings. Over two decades, he conducted forty such offerings, with BOKF serving as the indenture trustee on thirty-nine of them, according to the plaintiffs.

At some point, the plaintiffs allege, Brogdon began impermissibly commingling and misappropriating the bond funds and project revenues associated with his projects. (*Id.* ¶ 6). Eventually, he began to rely on the Debt Service Reserve Funds held in trust by BOKF in order to meet his debt service obligations. (*Id.*). As with the Loan Agreements governing the Edwards Offerings, Brogdon's offering documents required him to replenish the funds in a timely fashion, but he stopped making the required payments. (*Id.* ¶ 7). And there were other signs his finances were in disarray. One of his properties, for example, was eventually sold for unpaid taxes. (*Id.*).

As Brogdon's finances were deteriorating, Edwards and Barker were looking to buy. In April 2014, Edwards reached out to Brogdon about some of the facilities that Brogdon was selling in Georgia and Alabama. (*Id.* ¶ 13). A month later, Edwards and Barker agreed to buy four of them. By the end of the year, they had agreed to buy four more. (*Id.* ¶ 14). In putting the deals together, Edwards relied on two underwriters—Lawson Financial Corporation and Cantone Research, Inc.—that had helped Brogdon on many of his deals. Lawson, which had a prior relationship with BOKF, suggested Edwards use the bank as trustee on his offerings, and Edwards agreed. (*Id.* ¶ 16).

The plaintiffs claim that BOKF was highly motived to see the deals close. (Doc. 13 ¶ 72). BOKF, they allege, "was aware of, and heavily involved in" Brogdon's misconduct, and it knew

their complicity would come to light unless someone bailed him out by buying his facilities. (Doc. 13 ¶ 7). In order to make sure the offerings went through, the plaintiffs claim, BOKF never told Edwards and Barker that Brogdon was in dire financial straits, and it remained silent as Edwards executed official statements that made no mention of the bank's connection to Brogdon or his failure to abide by his own commitments to bondholders. (*Id.* at ¶ 73–74).

The plaintiffs further allege that, after the deals closed, BOKF turned a blind eye to various "red flags" as Edwards and Barker essentially repeated Brogdon's "Ponzi-like scheme." (Doc. 13 ¶ 20). For example, the Borrower LLCs never remitted enough money to BOKF to cover a management fee for Edwards and Barker. (*Id.* ¶ 77). Although failure to remit management fees to BOKF was not an Event of Default under the Loan Agreements, Columbus Loan Agreement, § 4.2(a)(vi), such a failure would have indicated to BOKF that the projects were producing only enough revenue to cover debt service and other hard costs, and that Edwards and Barker were not getting paid (at least not in the manner prescribed under the Offering Documents). BOKF also processed exorbitant requisitions, such as a $19,000 carpet bill that Edwards and Barker submitted as they undertook the redevelopment projects. (Doc. 13 ¶ 78).

Eventually, Edwards's finances began to fray. In December 2015, Edwards, now operating on his own due to a falling out with Barker, met with BOKF employees to request that the bank draw on four DSRFs to make upcoming debt service payments on four of the six offerings on which BOKF served as trustee. (*See id.* ¶ 24, 79). The plaintiffs allege that BOKF knew Edwards had been using personal funds to make debt service payments, and that it knew Edwards was requesting about $10,000 more than was necessary to cover the deficit he was running. (Doc. ¶ 79, 80). Nevertheless, BOKF agreed to his request and declined to invoke the "lockbox" provision in the Loan Agreements, which would have required Edwards to remit all facility revenues to BOKF

for safekeeping. (*Id.* ¶ 80–81). The draws began in February 2016. (*Id.* ¶ 24). By June 2016, Edwards stopped making replenishment payments on those DSRFs, even as he began drawing on two more. (*Id.*). BOKF declared a default on the bonds in August 2016 and began looking for receivers. (*Id.*). The plaintiffs allege that BOKF's failure to intervene allowed Edwards to defraud them and other investors of millions.

In connection with these allegations, the plaintiffs bring claims for (1) aiding and abetting common law fraud, (2) aiding and abetting breach of a fiduciary duty, (3) gross negligence, (4) negligence, (5) breach of fiduciary duty, and (6) violation of Georgia's Blue Sky Laws.

## II.    CHOICE OF LAW

The parties dispute which law governs the plaintiffs' tort claims. BOKF argues that the plaintiffs' claims are governed by choice-of-law clauses included in the Indentures, which call for the application of either Georgia or Alabama law, depending on the location of the project in question. The plaintiffs argue that their claims fall outside the choice-of-law clauses and are therefore governed by the law of either Oklahoma or Florida, the states with the most significant relationships to the plaintiffs' claims.

In a diversity action such as this, a district court must determine the applicable law according to the forum state's choice-of-law rules. *Pepsi-Cola Bottling Co. of Pittsburg v. PepsiCo, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005). And "the threshold question in determining the application of choice-of-law rules is whether there is a true conflict, a false conflict, or no conflict." *Nat'l Cas. Co. v. W. Express*, 356 F. Supp. 3d 1288, 1294 (W.D. Okla. 2018) (alteration in original) (quoting *Ky. Bluegrass Contracting, LLC v. Cincinnati Ins. Co.*, 363 P.3d 1270, 1274 (Okla. Civ. App. 2015)).

For the purpose of determining if a true conflict exists in this case, the Court distinguishes between two categories of issues: (1) issues specific to indenture trustees (e.g., whether and when

7

an indenture trustee may be sued in tort), and (2) and issues of tort law generally (e.g., whether a cause of action exists for aiding and abetting fraud).

With respect to issues falling in the first category, the Court finds no true conflict. The law of indenture trustees is highly specific and poorly developed outside New York, and the parties themselves—despite their choice-of-law arguments—rely almost exclusively on New York cases or cases applying New York law for propositions specific to indenture trustees.  Hence, regardless of which state's law nominally controls, the Court would turn to New York law as it pertains to the rights and duties of indenture trustees.

As for issues falling into the second category—i.e., issues relating to the relevant tort law— the Court finds a true conflict exists. The proposed states have materially different approaches to the business torts alleged in this case. Accordingly, the Court turns to Oklahoma's conflict rules to determine what body of law will supply the standards for the alleged torts.

Oklahoma courts will honor an effective choice-of-law provision, *Williams v. Shearson Lehman Bros.*, 917 P.2d 998, 1002 (Okla. Civ. App. 1995), but "[e]nforceability is not the same as scope." *Naturalock Sols., LLC v. Baxter Healthcare Corp.*, No. 14-CV-10113, 2016 WL 5792377, at *4 (N.D. Ill. Oct. 4, 2016). A choice-of-law provision will govern only those claims that the parties have agreed to resolve according to the law of the selected jurisdiction. *See, e.g.*, *Hawk Enterprises, Inc. v. Cash Am. Int'l, Inc.*, 282 P.3d 786, 790 (Okla. Civ. App. 2012). Here, the trust indentures include the following choice-of-law provision: "The effect and meaning hereof and the rights of all parties hereunder shall be governed by, and considered according to, the laws of the state of [Alabama or Georgia]." (Doc. 15-1 § 1411).

The Oklahoma Supreme Court has not squarely addressed the issue of scope as it pertains to a choice-of-law provision, but lower courts have held that a plaintiff's tort claims will fall

outside a clause unless its language indicates some intent to the contrary, reasoning that a choice-of-law provision, like any other agreement, should stretch only so far as its express terms allow. In *Hawk Enterprises*, the Court of Civil Appeals of Oklahoma held that a provision covering "all matters relating to [the agreement's] validity, construction, performance, and enforcement" did not extend to the plaintiff's tortious interference claim. 282 P.3d 786, 790 (Okla. Civ. App. 2012). Citing the provision's language, the court found that the clause was "not broad enough" to reach the plaintiff's tort claim. By contrast, in *Rawdon v. Starwood Capital Group,* the Court of Civil Appeals broadly construed a forum-selection clause because its language indicated an intent to govern more than just contract claims. 453 P.3d 516, 522–23 (Okla. Civ. App. 2019). There, the clause restricted venue to New York in "any action . . . arising out of, or relating to, [the] agreement." *Id.* at 520. The court reasoned that a party's obligation to litigate in a particular forum is, like any other obligation, to be determined by the language negotiated and agreed upon by the parties. *Id*. at 522. Because the provision in question used terms like "arising out of" and "relating to," the clause indicated an intent to cast a wider net than the choice-of-law clause in *Hawk Enterprises*, which directed application exclusively to questions of contract construction and enforcement. *Id.* (citing *Hawk Enterprises*, 282 P.3d 786). Citing cases where the parties had agreed to similarly broad language, the court held that the provision's language was capacious enough to embrace claims of fraud, breach of fiduciary duty, and conspiracy. *Id.* at 519, 522–23 (citing *Flanagan v. Access Midstream Partners*, L.P., No. 17-CV-315-GKF-JFJ, 2017 WL 4324535, at *2 (N.D. Okla. Sept. 28, 2017); *Cass v. Balboa Capital Group*, No. CIV-13-483-SPS, 2015 WL 1428076, at *1–2 (E.D. Okla. March 27, 2015).

At least one federal district court has construed Oklahoma law as requiring this textual approach when determining a choice-of-law provision's scope.[6] In *Naturalock Solutions*, the clause provided that the agreement in question was to be "governed by, and construed according to," Delaware law. *Naturalock*, 2016 WL 5792377 at *3. Citing the clause's "narrow language," the court held that the provision did not extend to the plaintiff's fraudulent inducement, negligence, and tortious interference claims. *Id.* at *4.

Taken together, *Hawk Enterprises*, *Rawdon*, and *Naturalock* stand for the proposition that a tort claim is outside a choice-of-law provision's scope unless the clause's language indicates an intent for the selected law to govern more than the meaning of the contract itself. By that standard, the plaintiffs' claims in this case fall outside the scope of the provision in the Indentures. The clause appears in a section titled "Laws Governing Indenture" and calls for the law of Georgia or Alabama to govern questions relating to "[t]he effect and meaning *hereof* and the rights of all parties *hereunder*." (Doc. 15-1 § 1411) (emphasis added). Like the language of the clause in *Hawk Enterprises*, this phrasing indicates an intent to apply the selected law to disputes over the contract itself. The plaintiffs' claims, however, allege breaches of common law duties existing independent of the contract. As a result, the claims lie beyond the provision's scope.

BOKF argues unpersuasively that an Oklahoma court would construe the provision more broadly. In support of that position, BOKF cites *Tribal Consortium, Inc. v. Pierson*, No. CIV-06-

---

[6]     *Pine Tel. Co. v. Alcatel Lucent USA Inc.*, a Tenth Circuit case, also lends support for the position that tort claims are presumptively outside the scope of a choice-of-law provision. 617 F. App'x 846 (10th Cir. 2015). There, the court applied a choice-of-law provision to the plaintiff's contract and warranty claims but not to its fraud claims because they did not "arise out of" the contract. *Id.* at 852. The case does little to illuminate the issue at hand, however, as the court did not discuss the clause in question, whose scope appears not to have been in dispute.

238-D, 2009 WL 5194374 (W.D. Okla. Dec. 28, 2009), which appears to be the lone case in which

a court applying Oklahoma's choice-of-law rules has held a plaintiff's tort claim to fall within the

scope of a narrowly drafted choice-of-law provision. In *Pierson*, a gambling-machine distributor

sued a manufacturer for fraud, alleging that the manufacturer had promised the exclusive right to

place machines in Oklahoma casinos. *Id.* at *1. Their agreement included the following choice-of-

law provision:

> This agreement will be governed by and construed in accordance with the laws of
> the State of Georgia. The parties consent to the jurisdiction of the courts of the State
> of Georgia. The parties hereto expressly waive all rights, which they may otherwise
> have under the laws of all other jurisdictions.

*Id *6.* Although the clause's language referenced only issues of contract construction, the court

held that the plaintiff's fraud claim fell within that narrow scope, reasoning that the premise of the

claim—that exclusivity was an unwritten term of the contract—implicated the parol evidence rule,

a substantive law of contract construction. *Id.* Because contract construction was within the scope

of the agreed-upon choice-of-law provision, the court held that Georgia law governed the

plaintiff's fraud claims. *Id.*

There are several reasons why an Oklahoma court might decline to follow *Pierson* in this

case. First, *Pierson* appears to be an outlier. The cases summarized above teach that, where a

clause's express terms limit its application to contract interpretation and enforcement, the

provision applies only to claims sounding in contract. Second, the plaintiff in *Pierson* failed to

properly brief the issue, resulting in what was arguably an incorrect decision. In *Pierson*, the court

reasoned that the plaintiff's fraud claim fell within the scope of the choice-of-law clause because

the claim implicated the parol evidence rule, which, as a rule of contract construction, was among

those issues that the parties agreed would be governed by Georgia law. In reaching this conclusion,

however, the court seems not to have accounted for the nature of the plaintiff's claim. Although

11

the parol evidence rule is a substantive law of contract construction, it does not apply to statements made in order to fraudulently induce the plaintiff's assent to the contract. *See First Nat. Bank in Durant v. Honey Creek Entm't Corp.*, 54 P.3d 100, 104 (Okla. 2002). ("It is well-established in Oklahoma that the parol evidence rule does not preclude evidence of false and fraudulent representations of fact offered to establish fraud in the inducement of the execution of a contract, even when those representations directly contradict the contract provisions."). If the fraud claim did not implicate the parol evidence rule—and, by extension, did not raise an issue of contract construction—then the claim was arguably outside the scope of the choice-of-law provision.

Third, a survey of the applicable law shows that the weight of authority favors the narrow construction of choice-of-law provisions where the express terms evince no contrary intent. *See* John F. Coyle, *The Canons of Construction for Choice-of-Law Clauses*, 92 Wash. L. Rev. 631, 666–79. (2017) (surveying states). Contrary to *Pierson*, courts following this approach do not inquire into the degree to which a tort claim may be intertwined with issues of contract.

> [Such courts] are generally uninterested in how closely the tort or statutory claims relate to the underlying contract claims. The judicial focus is on *characterization*. The courts want to know whether the claim sounds in contract or in tort or in a statute. If the claim sounds in tort, or if the claim is statutory, then it will not be covered by a generic choice-of-law clause. Such claims will only be covered if the choice-of-law clause is drafted so as to make clear the parties' intent that the chosen law apply to non-contractual claims.

*Id.* at 671.

In sum, the Court concludes that an Oklahoma court would hold the plaintiffs' claims to fall outside the scope of the choice-of-law provision in the indentures. Accordingly, the Court will apply Oklahoma's conflict rules to determine what law governs the plaintiffs' tort claims.

In a tort action, Oklahoma courts apply the law of the state with the most significant relationship to the occurrence and to the parties. *BancOklahoma Mortg. Corp. v. Capital Title Co.*, 194 F.3d 1089, 1103 (10th Cir. 1999) (citing *Childs v. Oklahoma ex rel. Oklahoma State Univ.*,

848 P.2d 571, 578 n.41 (Okla. 1993)). Factors relevant to this determination include: (1) the place where the injury occurred, (2) the place where the conduct causing the injury occurred, (3) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (4) the place where the relationship, if any, between the parties occurred. *Id.* at 1103–04 (citing *Brickner v. Gooden,* 525 P.2d 632, 637 (Okla. 1974)). Here, the injuries allegedly suffered by the named plaintiffs most likely occurred in Florida, where they are domiciled. The plaintiffs, however, purport to represent similarly situated investors whose domiciles may be elsewhere. As for the misconduct causing the injuries, much of the underlying misconduct (that attributed to Brogdon, Edwards, and Barker) appears to have occurred in Georgia. Those individuals, however, have not been named as defendants. The misconduct at the heart of this suit allegedly occurred in Tulsa, Oklahoma, and is attributed to BOKF, which is domiciled in Oklahoma. Under these circumstances, Oklahoma has the most significant relationship to the plaintiffs' tort claims. Accordingly, they are governed by Oklahoma law.

## III.    FAILURE TO STATE A CLAIM

BOKF, arguing that the plaintiffs' allegations fail to state a claim, moves to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

The Court's function on a Rule 12(b)(6) motion is not to weigh the evidence that the parties might present at trial, but to assess whether the plaintiff's complaint is legally sufficient to state a claim upon which relief may be granted. *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 757 F.3d 1125, 1135 (10th Cir. 2014). A complaint is legally sufficient only if it contains factual allegations such that it states a claim to relief that "is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Where the well-pleaded

facts permit the court to infer merely the possibility of misconduct, the complaint has alleged, but it has not shown, that the pleader is entitled to relief. *Id.* at 679.

In assessing a claim's plausibility, the Court must accept all well-pleaded facts as true and view them in the light most favorable to the plaintiff. *Brokers' Choice*, 757 F.3d at 1136. The Court is not bound to accept an allegation as true when it amounts to no more than a legal conclusion masquerading as fact. *Iqbal*, 556 U.S. at 678.

## A.    The Trust Indenture and BOKF's Duties

BOKF argues generally that the plaintiffs' tort claims fail as a matter of law because they are based on common law duties that BOKF, as an indenture trustee, did not owe. An indenture trustee's duties are, with two narrow exceptions, strictly limited to those imposed under the trust indenture. *AG Capital Funding Partners, L.P. v. State St. Bank & Tr. Co.*, 11 N.Y.3d 146, 156–57 (2008). Under the Indentures at issue here, BOKF's pre-default duties were essentially nonexistent. Section 1001, which sets out the bulk of BOKF's rights and obligations, provides:

> (a) The Trustee, prior to the occurrence of an Event of Default and after the curing or waiver of all events of default which may have occurred, undertakes to perform such duties and only such duties as are specifically set forth in this Indenture, and *no implied agreement or obligations shall be read into this Indenture against the Trustee*. In case an Event of Default has occurred and is continuing, the Trustee shall exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in their exercise, as a prudent person would exercise or use under the circumstances in a like situation.
> . . . .
> (c) The *Trustee shall not be responsible for any recital herein*, . . . and *the Trustee shall not be bound to ascertain or inquire as to the performance or observance* of *any agreements or conditions on the part . . . of the Borrower* under the Loan Agreement or the Security Deed except as hereinafter set forth . . . .
> . . . .
> (d) . . . Except to the extent herein specifically provided, *the Trustee shall not be accountable for the use of the proceeds of any of the Bonds*. . . .
> . . . .
> (e) Except as is otherwise provided in subsection (a) above:
>> . . . .
>> (iv) *The Trustee shall not be required to take notice or be deemed to have notice of any default hereunder* . . . unless the Trustee shall be specifically

14

> notified in writing of such default by the Issuer or by the holders of at least twenty-five percent (25%) in principal amount of the Bonds.
>     . . . .
> (f)  At reasonable times and as often as reasonably requested in connection with its rights under this Indenture, *the Trustee . . . shall have the right but not the obligation to inspect the Project* and all books, papers and records of the Issuer and the Borrower pertaining to the Project or Bonds and to make copies thereof and take such memoranda from and in regard thereto as may be desired.
> . . . .
> (l) *The Trustee shall have no responsibility with respect to any information, statement, or recital in any official statement*, offering memorandum or any other disclosure material prepared or distributed with respect to the Bonds.
> . . . .
> (p) The permissive right of the Trustee to do things enumerated in this Indenture shall not be construed as a duty.

(Doc. 15-4 § 1001) (emphasis added). Additionally, the Indentures provide that "the Trustee shall be relieved of all liability with respect to disbursements made in accordance with the provisions of . . . the Loan Agreement." (*Id.* § 603). Moreover, although the Loan Agreements required a Borrower LLC to submit written requisitions in order to access bond proceeds, BOKF was not required to verify any of the information provided.[7]

BOKF argues that, because it had no responsibility under the Indentures to verify the Borrower LLCs' representations in the Official Statements or to otherwise police their conduct, BOKF cannot be held liable in tort. (Doc. 15 at 12–13). This overstates the case.

While it is true that the pre-default duties of an indenture trustee are generally limited to those imposed under the indenture, an indenture trustee's power to disclaim responsibility does have limits. Exculpatory clauses cannot relieve one from liability for fraud, willful injury, gross

---

[7]     *See, e.g.*, Rome Loan Agreement, § 3.3, reprinted in Appendix A to the Dec. 17, 2014 Official Statement for the bonds issued under CUSIP Nos. 149596CF3, 149596CG1 ("In making any such payment from the Project Fund the Trustee may rely on any such requisitions and any such certificates delivered to it pursuant to this Section and the Trustee shall be relieved of all liability with respect to making such payments in accordance with any such requisitions and such supporting certificate or certificates without inspection of the Facility or any other investigation.").

negligence or violation of the law. *Schmidt v. United States*, 912 P.2d 871, 872 (Okla. 1996). Moreover, courts have found indenture trustees to have two kinds of pre-default duties beyond those found in their trust indentures. First, courts have held that indenture trustees have a duty not to profit at the expense of bondholders. *Dabney v. Chase Nat'l Bank,* 196 F.2d 668, 669–71 (2d Cir.1952) (L. Hand, J.), *U.S. Tr. Co. of New York v. First Nat. City Bank*, 57 A.D.2d 285, 296. (N.Y. App. Div. 1977). Courts often describe this duty, by way of shorthand, as a duty to avoid conflicts of interest. *See, e.g.*, *LNC Inv., Inc. v. First Fid. Bank, Nat. Ass'n*, 935 F. Supp. 1333, 1347 (S.D.N.Y. 1996). Second, indenture trustees must perform "basic, nondiscretionary, ministerial functions" with "due care." *AG Capital*, 11 N.Y.3d at 157*; see also LNC Inv*., 935 F. Supp at 1347; *N.Y. State Med. Care Facilities Fin. Agency v. Bank of Tokyo Tr. Co.*, 621 N.Y.S. 2d 466, 470 (N.Y. Sup. Ct. 1994).

Thus, even though BOKF disclaimed any duty to police the conduct of the Borrower LLCs, the plaintiffs may be able to state a claim if BOKF's alleged misconduct was willful, perpetrated a fraud, or breached an extra contractual duty.

### B.      Count 1: Aiding and Abetting Fraud

The plaintiffs' First Cause of Action is for aiding and abetting common law fraud. According to the plaintiffs, Edwards and Barker defrauded investors by failing to disclose that the bond funds would be commingled across projects used for purposes other than those specified in the Offering Documents. The plaintiffs allege that BOKF turned a blind eye their misconduct in order to conceal its complicity in Brogdon's own fraudulent conduct.

The Oklahoma Supreme Court has neither recognized nor declined to recognize a cause of action for aiding and abetting fraud. "Where an issue has not been decided by a state's highest court, federal courts 'must determine what decision that state court would make if faced with the same facts and issue.'" *Peel Payments, LLC v. First Data Corp.*, No. CIV-16-0425-HE, 2016 WL

6407432, at *2 (W.D. Okla. Oct. 28, 2016) (quoting *Oliveros v. Mitchell*, 449 F.3d 1091, 1093 (10th Cir. 2006)). In making this determination, "[t]he federal court should consider state court decisions, decisions of other states, federal decisions, and the general weight and trend of authority." *Armijo v. Ex Cam, Inc.*, 843 F.2d 406, 407 (10th Cir. 1988).

The doctrine of civil aiding-and-abetting liability is not entirely without support in the state's decisions. In *Keel v. Hainline*, a group of schoolboys were amusing themselves by throwing chalkboard erasers at one another when an errant toss struck a bystander, permanently damaging her eye. 331 P.2d 397, 398–99 (Okla. 1958). The Supreme Court held that one of the boys could be found liable for her injury on something like an aiding and abetting theory even though his participation in the fracas was limited to retrieving the erasers and handing them to the other defendants. The court reasoned that "[o]ne who commands, directs, advises, encourages, procures, instigates, promotes, controls, aids, or abets a wrongful act by another has been regarded as being as responsible as the one who commits the act so as to impose liability upon the former to the same extent as if he had performed the act himself." *Id.* at 401 (quoting 52 Am. Jur. 454, 1st *Torts* § 114).

Notwithstanding the court's sweeping language, there are several reasons to believe that it would decline to extend *Keel* to recognize a cause of action for aiding and abetting fraud. First, in the sixty years since *Keel* was decided, only one Oklahoma court appears to have extended *Keel* beyond the battery context. *See Cooper v. Bondoni*, 841 P.2d 608, 611 (Okla. Civ. App. 1992) (holding that passengers could be jointly liable with a negligent driver because they encouraged her to break traffic laws).

Second, at the time the court decided *Keel*, civil aiding and abetting liability was "largely confined to isolated acts of adolescents in rural society." *Halberstam v. Welch*, 705 F.2d 472, 489

(1983). Recognition of aiding and abetting fraud in particular appears to have been a relatively recent phenomenon, having developed largely in the context of statutory securities violations. *Cent. Bank, N.A. v. First Interstate Bank, N.A.*, 511 U.S. 164, 181 (1994); *see also F.D.I.C. v. S. Prawer & Co.*, 829 F. Supp. 453, 457 (D. Me. 1993) (noting that "aiding and abetting liability did not exist under the common law, but was entirely a creature of statute"). Consequently, although *Keel*'s expansive language would seem to support aiding and abetting liability for any underlying tort, including fraud, the *Keel* court may not have anticipated its application in the fraud context, where the secondary actor's "aid" often consists of inaction or silence rather than affirmative conduct.

Third, two district courts have dismissed fraud claims against secondary actors based on the assumption that Oklahoma does not recognize a cause of action for aiding and abetting fraud. *Transp. All. Bank, Inc. v. Arrow Trucking Co.*, No. 10-CV-16-GKF-PJC, 2011 WL 221863, at *5 (N.D. Okla. Jan. 21, 2011); *Eastwood v. Nat'l Bank of Commerce, Altus, Okl.*, 673 F. Supp. 1068, 1081 (W.D. Okla. 1987); *contra Energy Fluids, Inc. v. Cimarex Energy Co.*, No. CIV-07-0653-HE, 2008 WL 2404226, *3 (W.D. Okla. June 10, 2008) (citing *Cooper,* 841 P.2d at 611) (declining to dismiss a fraud claim against a defendant who had made no misrepresentation himself because he allegedly trained others on how to execute the fraud). Given these considerations, the Court cannot predict that the Oklahoma Supreme Court would recognize a cause of action for aiding and abetting fraud in this case.

Moreover, even if the cause of action were to exist, the allegations in this case are insufficient to state a claim. The elements of aiding and abetting common law fraud are generally recognized to be (1) the existence of an underlying fraud; (2) the aider and abettor's knowledge of this fraud, and; (3) substantial assistance by the aider and abettor in perpetration of the fraud. *See*

*Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292 (2d Cir. 2006); *Ryan v. Hunton & Williams*, No. 99-CV-5938 (JG), 2000 WL 1375265, at *8 (E.D.N.Y. Sept. 20, 2000). Actual knowledge of the fraud is required unless the alleged aider and abettor owed a fiduciary duty to the plaintiff, in which case "reckless disregard of the facts" is enough to satisfy the knowledge requirement. *See United States v. Dist. Council of New York City*, No. 90CIV.5722(CSH), 2007 WL 2697135, at *16 (S.D.N.Y. Sept. 17, 2007) (citing *Armstrong v. McAlpin*, 699 F.2d 79, 91 (2d Cir.1983)). Similarly, "[i]naction on the part of the alleged aider and abettor ordinarily should not be treated as substantial assistance, except when it was designed intentionally to aid the primary fraud or it was in conscious and reckless violation of a duty to act." *Id.* (alteration in original) (quoting *Armstrong*, 699 F.2d at 91).

Here, BOKF's contractual duties were extremely limited prior to an Event of Default as defined in the Indentures. Under the Indentures, BOKF was responsible for administering the various funds dedicated to bond proceeds, project revenues, and debt service payments, but it disclaimed any duty responsibility for the conduct of the Borrower LLCs. Notably, BOKF disclaimed any responsibility for any the information in the official statements executed by Edwards, (Doc. 15-4 § 1001(l)); any duty to verify the Borrower LLCs compliance with its contractual obligations, (*Id.* § 1001(c)); and any responsibility for the manner in which they used bond proceeds, (*Id.* §§ 603, 1001(d)).

The bank's extra-contractual duties were similarly limited pre-default. Apart from its responsibilities under the Indentures, BOKF's only pre-default duties were to avoid conflicts of interest and to perform ministerial tasks with due care. *LNC*, 935 F. Supp. at 1347. The plaintiffs argue that BOKF's duty to avoid conflicts of interest entailed a duty to disclose its relationship to Brogdon and his history of misconduct and financial problems. As the Court will discuss below,

that may well have been the case, but the existence of just any duty will not vitiate the plaintiffs' burden to allege actual knowledge. The defendant must have had some independent duty of disclosure or responsibility for the misrepresentations forming *the underlying fraud*. *IIT v. Cornfeld*, 619 F.2d 909, 925 (2d Cir. 1980) (reasoning that the scope of the defendant's duty to the plaintiffs did not include responsibility for the alleged misrepresentations). Here, the plaintiffs have accused Edward and Barker of failing to disclose their intent to commingle bond proceeds and project revenues, not concealing anything about Brogdon or his financial troubles. Because the underlying fraud had nothing to do with the information BOKF arguably had a duty to disclose, that duty is irrelevant to determining the requisite degree of scienter.

In short, BOKF was not responsible for the promises Edwards made to investors and it had no duty to investigate the Borrower LLCs' compliance with their contractual obligations. Accordingly, even assuming that Oklahoma would recognize a claim for aiding and abetting fraud, such a claim would only be viable upon allegations (1) that BOKF had actual knowledge that Edwards and Barker were defrauding investors by commingling and misappropriating funds, and (2) that BOKF, by its silence, intended to aid in the fraud.

The plaintiffs' complaint fails to plead actual knowledge of the underlying fraud. In their Response, the plaintiffs say that BOKF "willingly and knowingly assisted Edwards and Barker," but their complaint never makes such a stark allegation. The closest the plaintiffs come to pleading actual knowledge of the underlying fraud is the allegation that BOKF "was aware of its role in the fraudulent scheme orchestrated by Edwards and Barker." (Doc. 13 ¶ 101). Knowledge may be pleaded generally under Rule 9, but it must still contain enough information to put the defendant on notice of the factual basis for the claims against them. Here, BOKF's liability is entirely dependent on what it knew, yet, at no point do the plaintiffs allege that BOKF had actual

knowledge that funds were being impermissibly commingled or misappropriated. Instead, they allege only that BOKF ignored various "red flags" that, had the bank been more diligent, would have led it to discover the misconduct. Because the plaintiffs have not adequately pleaded this knowledge, their allegations fail to state a claim for aiding and abetting fraud.

### C. Count 2: Aiding and Abetting Breach of a Fiduciary Duty

As with aiding and abetting common law fraud, the question of whether a cause of action for aiding and abetting breach of a fiduciary duty exists in Oklahoma is unresolved. *Jackson v. GreerWalker, LLP*, No. 17-CV-0436-CVE-FHM, 2018 U.S. Dist. LEXIS 24167, *10 (N.D. Okla. Feb. 14, 2018). As explained above, however, Oklahoma courts have imposed civil aiding-and-abetting liability in only a handful of contexts, so it seems doubtful that the Oklahoma Supreme Court would expand the doctrine to cover aiding and abetting breach of fiduciary duty. More importantly, even if the court were inclined to do so, the plaintiffs have not alleged the necessary elements.

In order to state a claim for aiding and abetting breach of fiduciary duty, a plaintiff must allege the existence of a fiduciary duty on the party of the primary wrongdoer. *AmeriFirst Bank v. Bomar*, 757 F. Supp. 1365, 1380. (S.D. Fla. 1991); *Holmes v. Young,* 885 P.2d 305, 309 (Colo. App. 1994). Under Oklahoma law, a fiduciary relationship "exists when one person acquires influence over another such that the influenced allows the influencer to substitute his or her will for the influenced's own." *Horton v. Hamilton*, 345 P.3d 357, 364 (Okla. 2015). The plaintiffs have not explained how the status of Edwards and Barker as "the controlling forces behind each of the borrower entities and of the Edwards Offerings," (Doc. 13 ¶ 103), established a fiduciary relationship as defined by Oklahoma or any other state.

Moreover, even were Oklahoma to recognize a claim for aiding and abetting a breach of a fiduciary duty, any such claim would require an allegation that the defendant had knowledge of

the primary actor's wrongful conduct. *Bomar*, 757 F. Supp. at 1380. To the extent the plaintiffs intend to assert that Edwards and Barker owed a fiduciary duty not to commingle and misappropriate funds, their allegations fall short. As explained above, the plaintiffs have not alleged actual knowledge that funds were commingled or misappropriated.

### D.      Counts 3 and 4: Gross Negligence, Negligence

In Count 3, the plaintiffs claim that BOKF acted with gross negligence when it (1) "ignored an obvious conflict of interest," (2) "did not require the filing of financial statement [sic]" (3) "did not collect monthly management fees," (4) "directly ignored red flags suggesting poor management of the facilities," (5) "failed to ensure that proper use of revenues and funds," (6) "permitted improper transfers," and (7) "processed multiple draws on the DSRFs." (Doc. 13 ¶ 107). Alternatively, the plaintiffs claim in Count 4 that BOKF's conduct "was a negligent breach of the duties" it owed to the plaintiffs. (*Id.*).

Of the conduct enumerated above, the acts and omissions numbered (3) through (6) cannot support a negligence claim. The threshold question in any action for negligence is the existence of a duty. *Trinity Baptist Church v. Bhd. Mut. Ins. Servs., LLC*, 341 P.3d 75, 82 (Okla. 2014). BOKF expressly disclaimed any duty to monitor the Borrower LLCs management practices and use of bond proceeds. The plaintiffs try to work around this fact by casting the alleged acts and omissions as breaches of BOKF's extra-contractual duty to carry out ministerial tasks with due care, but this argument is wafer thin. The Court cannot interpret "ministerial tasks" to include duties that, by virtue of the Indentures, did not exist. Reading the ministerial-tasks exception so broadly would swallow whole the general rule that an indenture trustee's pre-default duties are exclusively governed by the terms of the trust indenture.

Regarding allegation number (7), BOKF did have a duty to process draws on the DSRFs in accordance with the Indentures, which provide that the money in the DSRFs "shall be . . . used

to pay principal and interest on the Bonds to the extent funds are otherwise unavailable therefore in the Bond Fund." (Doc. 15-4 § 606). However, BOKF's alleged negligence in processing these claims is not actionable in tort because the duty in question is contractual, rather than extra contractual. *See Blackrock Allocation Target Shares: Series S. Portfolio v. Wells Fargo Bank, Nat'l Ass'n*, 247 F. Supp. 3d 377, 394–95 (S.D.N.Y. 2017); *Phx. Light SF Ltd. v. Deutsche Bank Nat'l Tr. Co.*, 172 F. Supp. 3d 700, 718 (S.D.N.Y. 2016).

The remaining negligent acts do implicate extra contractual duties. Regarding BOKF's alleged failure to require the Borrower LLCs to file financial statements, the Official Statements refer to a Continuing Disclosure Agreement ("CDA") requiring the Borrower LLCs to submit certain information and financial statements to EMMA. On the Brogdon offerings, the CDA designated BOKF as the dissemination agent for the required disclosures, meaning BOKF was obligated to either collect the financial statements from Brogdon and post them on his behalf or post notices that Brogdon had failed to provide the statements as required. (Doc. 23-1 at 4–5). It is unclear whether BOKF was the dissemination agent here, but if BOKF knew Brogdon was not fulfilling his continuing disclosure obligations, BOKF may have had an extra-contractual, nondiscretionary duty to post notice of that fact for the benefit of investors. Resolving the precise boundaries of BOKFs duties regarding the collection and posting of financial information involves questions of fact that cannot be resolved on a motion to dismiss.

Regarding the alleged conflict of interests, the bank did owe a duty not to seek a personal benefit at the expense of bond holders. *Elliott Assocs. v. J. Henry Schroder Bank & Tr. Co.*, 838 F.2d 66, 73 (2d Cir. 1988); *see also Dabney*, 196 F.2d at 670 ("[A]ll that counts is that the trustee's decision–whether to exercise, or not to exercise, the power–shall be free from conflicting personal motives."). The plaintiffs allege that BOKF remained silent about Brogdon's misconduct and

financial troubles because it wanted the Edwards Offerings to go through so Edwards and Barker could buy Brogdon out and, in doing so, prevent BOKF's alleged complicity from coming to light. These allegations are sufficient to implicate the duty to avoid conflicts of interests. Whether BOKF breached that duty in a way that entitles the plaintiffs to damages is not a question that can be resolved on a dismissal motion.

Having concluded that the plaintiffs' allegations implicate BOKF's pre-default duties to avoid conflicts and complete ministerial tasks with due care, the question becomes what standard of care applied to those duties. An indenture trustee's pre-default duties are not fiduciary in nature. *BlackRock*, 247 F. Supp. 3d at 395. And a trustee may contractually limit liability for its own negligence if the limitation is explicitly and unambiguously provided for in the agreement. *See Phx. Light SF Ltd. v. Bank of N.Y. Mellon*, No. 14-CV-10104 VEC, 2015 WL 5710645, at *8 (S.D.N.Y. Sept. 29, 2015); *also N.Y. State Med. Care Facilities Fin. Agency v. Bank of Tokyo Tr. Co.*, 163 Misc. 2d 551, 556–58 (N.Y. Sup. Ct. 1994). Here, the Indentures provided that "the Trustee shall not be answerable for other than its gross negligence or willful misconduct." (Doc. 15-4 § 1001(e)(iii)). This unambiguously precludes the imposition of liability on a theory of mere negligence. As a result, the plaintiffs must allege gross negligence, which Oklahoma defines as an "intentional failure to perform [a] manifest duty in reckless disregard of consequences." *Martin v. A.C.G., Inc.*, 965 P.2d 995, 997 (Okla. Civ. App. 1998). The Court finds that the plaintiffs' allegations regarding BOKF's alleged failure to post notice of material events and to avoid conflicts of interest plausibly state a claim for gross negligence under this standard.

### E.    Count 5: Breach of Fiduciary Duty

In Count 5, the plaintiffs claim that BOKF "had a fiduciary relationship" with bondholders that rendered BOKF responsible for

> protecting and overseeing the investment proceeds, ensuring that revenues and funds were being used properly and in accordance with their stated purposes, requiring and reviewing financial statements, guarding against and securing any deficiencies, and declaring default as soon as any actions triggering a default occurred.

(Doc. 13 ¶ 117). The plaintiffs further claim that its status as a fiduciary imposed a duty to disclose

> events of default, uses of funds not in accordance with their stated purpose, and important and material information related to the investment and/or the bond program—including information about the individuals running the bond program, such as the split between Edwards and Barker, and information about the facilities being acquired (i.e., that they were from Brogdon).

(*Id.*).

Many of these responsibilities relate to BOKF's pre-default conduct, which cannot serve as the foundation for a breach-of-fiduciary duty claim. A trustee's pre-default duties are not "fiduciary in nature." *BlackRock*, 247 F. Supp. 3d at 395.[8]

BOKF's post-default duties are another matter. Following an event of default, an indenture trustee's duties to bondholders "come more closely to resemble those of an ordinary fiduciary, regardless of any limitations or exculpatory provisions contained in the indenture." *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 192 (S.D.N.Y. 2011) (quoting *Beck v. Mfrs. Hanover Trust Co.,* 218 A.D.2d 1, 13 (N.Y. 1995)). After default, a trustee is not required to act beyond the powers conferred by the governing agreements, but it "must, as prudence dictates, exercise those singularly conferred prerogatives in order to secure the basic purpose of any trust indenture, the repayment of the underlying obligation." *BlackRock*, 247 F. Supp. 3d at 396. Thus, the plaintiffs might be able to state a claim for breach of fiduciary duty if,

---

[8] Although early cases sometimes refer to an indenture trustee's pre-default duties as "fiduciary," New York has since made clear that a trustee's pre-default duties are not fiduciary in nature. *Royal Park Investments SA/NV v. HSBC Bank USA, Nat. Ass'n*, 109 F. Supp. 3d 587, 597 (S.D.N.Y. 2015).

after an Event of Default as defined under the Indentures, BOKF failed to exercise its powers to protect bondholders.

Here, however, the gravamen of the plaintiffs' complaint is not that BOKF failed to properly respond to an identified Event of Default, it is that BOKF failed to discover the default in the first place. (*See, e.g.*, Doc. 13 ¶ 77) ("Defendant BOKF could not determine whether there was an event of default because it totally abdicated its responsibility . . . ."). The Indentures preclude recovery on such a theory. Under the Indentures, BOKF disclaimed any duty to "ascertain or inquire" as to the Borrower LLCs' performance of their obligations. (Doc. 15-4 § 1001(c)). Moreover, the Indentures provide that, with the exception of a failure to make payment, the "Trustee shall not be required to take notice or be deemed to have notice of any default" unless notified by the issuer or bondholders representing 25 percent of the bond principal. (Doc. 15-4 § 1001(e)(iv)). To construe BOKF's post-default fiduciary duties as entailing a duty to discover the default in the first instance would effectively re-instate the duties that BOKF disclaimed in the Indentures. Thus, in order to state a claim for breach of a fiduciary duty, the plaintiffs must clearly allege (1) an Event of Default, (2) BOKF's actual knowledge of the default, if other than a failure to make payment, and (3) BOKF's subsequent failure to prudently exercise its powers to protect the interests of bondholders. As they fail to do so, they have not stated a claim for breach of fiduciary duty.

## F.    Count 6: Civil Conspiracy

The plaintiffs claim that BOKF "entered into a conspiracy to perpetrate this illegal and fraudulent scheme with Edwards and Barker." (Doc. 13 ¶ 120). Under Oklahoma law, a civil conspiracy "consists of a combination of two or more persons to do an unlawful act, or to do a lawful act by unlawful means." *Brock v. Thompson,* 948 P.2d 279, 294 (Okla. 1997). To prove a civil conspiracy claim, a plaintiff is required to show an agreement between two or more people

to accomplish a particular objective; a meeting of the minds regarding the objective or course of action; one or more unlawful, overt act; and damages, proximately caused by the conspiracy. *Schovanec v. Archdiocese of Oklahoma City,* 188 P.3d 158, 175 (Okla. 2008) (citing *Closs v. Goose Creek Consol. Indep. Sch. Dist.*, 874 S.W.2d 859, 871–72 (Tex. App. 1994)). Nowhere in the complaint do the plaintiffs allege that BOKF entered into any kind of agreement, implicit or explicit, with Edwards and Barker. As a result, their allegations fail to state a claim for civil conspiracy.

### G.    Count 7: Georgia Blue Sky Law Violations

Finally, the plaintiffs claim that BOKF is secondarily liable under Georgia's Uniform Securities Act of 2008 (the "Blue Sky Law") for the bank's role in the fraud allegedly perpetrated by Edwards and Barker.

As a preliminary matter, this claim must be dismissed with respect to the bonds issued by the Medical Clinic Board of the City of Montgomery on behalf of borrower Montgomery ALF, LLC.[9] The relevant provisions of Georgia's Blue Sky Law do not apply "unless the offer to sell or the sale is made in [Georgia]." Ga. Code Ann. § 10-5-79(a). An offer qualifies as being "made" in Georgia if (1) the offer "originates" in Georgia or (2) the offer is directed to, and received at, a place in Georgia. § 10-5-79(c). Here, the plaintiffs, who are all residents of Florida, do not allege that any of them purchased the Montgomery bonds in Georgia or as the result of an offer made or received in Georgia. Instead, they argue that the Court should permit the claims to advance because some members of the putative class may turn out to be Georgia residents. The Court is unpersuaded. While it is true that some yet-to-be-identified member of a putative, yet-to-be-

---

[9]    For the indenture and official statement associated with the Montgomery Offering, see Docs. 15-1, 15-7.

certified class might have purchased the Montgomery bonds in Georgia, the plaintiffs did not. Accordingly, their statutory claims must be dismissed with respect to the Montgomery bonds.

Ultimately though, the question of applicability is academic because the plaintiffs' allegations fail to state a claim under Georgia's Blue Sky law. The statute provides in relevant part that a person is liable to the purchaser of a security if the person "sells a security . . . by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statement made, in light of the circumstances under which it is made, not misleading." Ga. Code. Ann. § 10-5-58(b). The statute further provides that "an individual" is jointly liable with the seller if the individual  is "associated" with the seller and "materially aids the conduct giving rise to the liability, unless the individual sustains the burden of proof that the individual did not know and, in the exercise of reasonable care could not have known, of the existence of conduct by reason of which the liability is alleged to exist." *Id.* § 10-5-58(g)(3).

Even if the Court assumes that Edwards and Barker qualify as "sellers" within the meaning of the statute, and that BOKF was "associated" with them, the plaintiffs' claims would fail because BOKF's alleged conduct did not "materially aid[] the conduct giving rise to the liability." Georgia Courts do not appear to have announced a clear standard for what constitutes "material aid," but other states have underscored the importance of a relationship between the secondary actor's role in the transaction and the violation by which the primary actor accomplished the fraudulent sale. *See, e.g., Conn. Nat'l Bank v. Giacomi*, 699 A.2d 101, 121–22 (1997) (reasoning that the secondary actor provided material aid because his actions had a "natural tendency to influence the decision" of the buyer and "helped procure reliance" on the underlying misrepresentation). Here, the plaintiffs allege that BOKF aided Edwards and Barker when it (1) "withheld material information related to Brogdon," (2) "failed to disclose to investors that Edwards and Barker were acquiring

the struggling facilities from Brogdon," and (3) "failed to disclose the financial difficulties plaguing both the facilities and Brogdon." (Doc. 13 ¶ 132). That conduct, however, was irrelevant to the misrepresentation attributed to Edwards and Barker—namely, that bond funds and project revenues would be used only for authorized purposes and not commingled with other funds. Because their alleged violation had nothing to do with concealing Brogdon's misconduct or financial troubles, BOKF's alleged failure to disclose that information did nothing to help procure investors' reliance on the underlying misrepresentations. Given the lack of any nexus between BOKF's conduct and the primary violation, BOKF cannot be said to have "materially aided the conduct giving rise to the liability."

## IV.    CONCLUSION

For the reasons explained above, the Court finds that the plaintiffs' allegations fail to state a claim for aiding and abetting fraud, aiding and abetting breach of a fiduciary duty, breach of fiduciary duty, simple negligence, conspiracy, and violation of Georgia's Blue Sky Law. The Court, however, finds that the plaintiffs' allegations state a claim for gross negligence. Accordingly, Defendant BOKF's Motion to Dismiss (Doc. 15) is **granted in part** (as to Counts 1, 2, 4, 5, 6, and 7) and **denied in part** (as to Count 3).

With respect to their claims for breach of fiduciary duty (Count 5) and violation of Georgia's Blue Sky Law (Count 7), the plaintiffs may file an amended complaint, within fourteen days of the entry of this order, if they wish to attempt to state plausible claims under those theories. As to the other claims dismissed by this Order, the Court finds amendment would be futile or is otherwise not justified.

SO ORDERED this 8th day of July, 2020.

_____
JOHN E. DOWDELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT